ENSERVCO, INC., Western Environmental Resources, Inc., Associated Environmental Systems, Inc., and Don James, Appellants–Plaintiffs,

v.

STATE of Indiana, OFFICE OF the SECRETARY OF STATE, SECURITIES DIVISION; and Mark E. Maddox, as Indiana Securities Commissioner, Appellees–Defendants.

No. 49A02–9111–CV–503.

Court of Appeals of Indiana,
Second District.

Dec. 31, 1992.

Robert S. Walters, Barrett & McNagny, Fort Wayne, for appellants-plaintiffs.

Linley E. Pearson, Atty. Gen., John M. White, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for appellees-defendants.

SULLIVAN, Judge.

Enservco, Inc., Western Environmental Resources, Inc., Associated Environmental Systems, Inc., all California corporations, and Don James, President of Enservco and Western Environmental Resources, Inc., (collectively "Enservco" or "Appellants") appeal the judgment of the Marion Circuit Court, Marion County, Indiana affirming the Indiana Securities Commissioner's Findings of Fact, Conclusions of Law, and Final Order (Order) which adjudged that Appellants had violated the antifraud provisions of the Indiana Franchise Act (Franchise Act).[1]

We reverse the trial court's affirmance of the Commissioner's Order and remand with instructions that the Commissioner set aside his Order which adjudged that Appellants violated the Franchise Act and which revoked Appellants' exemption from franchise registration.

Appellants present several issues for review. We deem the following issue dispositive:

Whether there is substantial evidence of record to support the Indiana Securities

---

1. I.C. 23–2–2.5–27 (Burns Code Ed.1989).

**258**

Commissioner's Order and its subsequent affirmance by the Marion Circuit Court?

On August 14, 1989, the Indiana Securities Division filed an administrative complaint with the Indiana Securities Commissioner (Commissioner) alleging violations of I.C. 23-2-2.5-27. Specifically, Appellants were charged with engaging in acts, practices, and a course of business which operated as a fraud or deceit upon investors and with making untrue statements of material facts in connection with the sale of a franchise[2] within the State of Indiana.

Appellants were engaged in the offer and sale of an underground tank testing enterprise.[3] After meeting with Don James, the Appellants' representative, Associated Environmental Systems (AES)/Indiana, an Indiana Corporation[4], purchased the rights to a computer system designed to test underground tanks and entered into a License Agreement (Agreement) on March 1, 1988, which granted AES/Indiana a twenty-five year exclusive technology license in the State of Indiana. The terms of the Agreement required AES/Indiana to remit an initial fee of $72,000 and an ongoing royalty fee equal to twenty percent of AES/Indiana's gross revenues. AES/Indiana purchased the testing and measuring equipment and the specially-equipped vans needed to begin the testing business in Indiana. Subsequent to commencing operations, AES/Indiana contacted the Indiana Securities Division and alleged certain acts of wrongful conduct on the part of Appellants concerning the offer and sale of the franchise.

Petitioner sought a cease and desist order and other appropriate relief with respect to Appellants' alleged violations of the antifraud provisions. The Commissioner conducted an administrative hearing upon the complaint in January, 1990. At the hearing, Appellants presented a unified challenge to the charges. On January 30, 1990, the Commissioner ordered Appellants to cease and desist from violations of the antifraud provisions, revoked Appellants' exemptions[5] from franchise registration pursuant to I.C. 23-2-2.5-3, and ordered Appellants to pay the costs of the administrative action.

Enservco/Appellants challenge the Order, and its subsequent affirmance by the Marion Circuit Court, upon grounds that the evidence is insufficient to support the findings of fact and conclusions. Specifically, Enservco attacks three findings which led to the Commissioner's conclusion that Enservco engaged in fraudulent conduct in the offer and sale of a franchise. The three findings in question have been identified as the EPA (Environmental Protection Agency) Test issue, the Testing Time issue, and the Option/First Right of Refusal Issue.[6] The factual underpinnings

---

**2.** The Appellants do not challenge their status as franchisors nor do they dispute that the acts in question involve a franchise as that term is defined under I.C. 23-2-2.5-1(a) (Burns Code Ed.1989) of the Indiana Franchise Act.

**3.** Although seemingly independent parties, each appellant contributed a different link in the chain of events which precipitated the complaint. In brief, the relationship between the appellant corporations is as follows: Enservco owns proprietary rights to a computer-driven software system used in conjunction with fluid testing and measuring equipment; Western sells testing equipment and hardware; Associated Environmental Systems (AES) operates an underground tank-testing service utilizing Enservco's computer technology and Western-supplied hardware; Don James is a shareholder, officer, and director of all three corporations.

**4.** AES/Indiana is a corporation separate and distinct from AES, the California corporation.

**5.** The record does not reflect the basis upon which Enservco's exempt status was granted. A franchisor may become exempt from certain provisions of the Franchise Act, specifically sections 9 through 25, if one of the exempt categories enumerated in I.C. 23-2-2.5-3 (Burns Code Ed.1989) is met. Apparently, at the time of the offer and sale to AES/Indiana, Enservco operated under a franchise exemption.

**6.** Our review necessarily focuses upon the decision of the Marion Circuit Court. However, because it incorporates the conclusions of the Commissioner, our review must include the administrative determination and the evidence in support. The trial court relied upon and affirmed the Commissioner's conclusions in the January 30, 1990 Order.

The trial court found that Enservco:
"a. Failed to disclose the material fact of the results of EPA testing which indicated that the AES tank testing equipment failed to meet EPA standards.

of this case can best be explored within the context of our discussion of the three issues below.

## I. Introduction

This case presents a question of first impression regarding administrative enforcement pursuant to the antifraud provisions of the Indiana Franchise Act.[7] In 1975, the Indiana General Assembly enacted legislation designed to prevent franchise sale abuses.[8] The Act has been viewed as embodying "crucial policy choices affirmatively made by the legislature in an effort to balance, in a way that makes sense in the commercial and social life of Indiana, the freedom to enter into contracts and the need to regulate the practices of the franchise industry." *Wright–Moore Corporation v. Ricoh Corporation* (1990) 7th Cir., 908 F.2d 128, 142 (Ripple, J., dissenting).

The purpose of the Act is to ensure that

"the practice or commission of fraud may be prohibited and prevented, [and that] disclosure of sufficient and reliable information in order to afford reasonable opportunity for the exercise of independent judgment of the persons involved may be assured, in connection with the issuance, barter, sale, purchase, transfer

or disposition of franchises in this state." I.C. 23–2–2.5–47.

Two major mechanisms protect against abuses in the offer, sale, and purchase of franchises. *See* Gerald Bepko, *Survey of Recent Developments in Indiana Law–Contracts and Commercial Law*, 9 Ind. L.Rev. 132, 152 (1975) [hereinafter "Contracts and Commercial Law"]. The focus in the instant case falls upon the mechanism permitting public action taken by the securities commissioner.[9]

Generally, franchisors must register with the securities commissioner before the offer or sale of a franchise. I.C. 23–2–2.5–9. The registered franchisors are then subject to the jurisdiction of the securities commissioner who is authorized to implement several actions to protect prospective franchisees.[10] As noted in footnote 5, *supra*, Enservco was apparently exempt from registration pursuant to I.C. 23–2–2.5–3, although the record does not disclose under which subsection the exemption arose. Once Enservco attained exempt status, several of the oversight procedures of the Securities Division were removed.[11] Nevertheless, Enservco was not empowered to operate entirely beyond the bounds of the Franchise Act.

---

b. Failed to disclose the material fact that tank testing would take much longer to complete due to a difference in temperature and climate changes between Indiana and California.
c. Agreed to grant AES of Indiana an option or first right of refusal on a franchise in Ohio, which was a material fact in the decision of AES of Indiana to enter into an agreement with the Plaintiffs, and that the Plaintiff's revocation of this option or first right of refusal was a fraud upon AES of Indiana." Record at 544.

7. Several Indiana decisions discuss private civil actions grounded upon the antifraud provisions of the Franchise Act. *See, e.g., Master Abrasives Corp. v. Williams* (1984) 4th Dist.Ind.App., 469 N.E.2d 1196, and *Moll v. South Central Solar Systems, Inc.* (1981) 1st Dist.Ind.App., 419 N.E.2d 154. Although these cases, cited by both parties, may provide some insight into the intent of the legislature in enacting antifraud provisions, the importance of the issue at hand requires an independent analysis of the portion of the statutory scheme which empowers the Indiana Securities Commission to pursue administrative actions and/or remedies.

8. For present provisions see I.C. 23–2–2.5–1 to –51 (Burns Code Ed.1989 & Supp.1992).

9. According to Professor Bepko, the second protective mechanism is private civil action pursuant to I.C. 23–2–2.5–27. *See Contracts and Commercial Law, supra,* at 153. This was the private remedy pursued in *Master Abrasives, supra,* and *Moll, supra.*

10. In brief, the commissioner may implement and maintain franchise registration procedures, impound franchise fees if franchise applicants are inadequately financed, issue stop orders "denying the effectiveness of or suspending or revoking the effectiveness of a registration", I.C. 23–2–2.5–14, seek injunctive or other relief to end prohibited franchise practices, conduct investigations regarding potential violations of the law, review franchise advertisements, and refer violators to the prosecuting attorney for criminal action. *See Contracts and Commercial Law, supra,* at 152–53 (citations omitted).

11. *See, e.g.,* I.C. 23–2–2.5–9 to –25.

Notwithstanding fulfillment of the requirements for exemption under I.C. 23–2–2.5–3, Enservco must comply with I.C. 23–2–2.5–27. This section has been characterized as an "antifraud" provision which prohibits the offer, sale, or purchase of any franchise by means which directly or indirectly involve fraud, deceit, or misrepresentation. *Moll, supra,* 419 N.E.2d at 162. If the commissioner opines that a franchisor is engaged in unlawful conduct, a cease and desist order may issue restraining the further offer or sale of the franchise until compliance, i.e., non-fraudulent conduct, is achieved. I.C. 23–2–2.5–35. In the instant case, subsequent to a hearing with respect to the alleged unlawful conduct, the Commissioner ordered Enservco to cease and desist from violations of the antifraud provisions and then ordered a revocation of Enservco's exempt status. We take this opportunity to articulate the required elements of an administrative enforcement action under I.C. 23–2–2.5–27 and to reiterate the appropriate standard of review of administrative proceedings before the Indiana Securities Commissioner.

### A. Elements

■ The elements of an antifraud violation were first delineated within the context of the private civil remedy in *Moll v. South Central Solar Systems, Inc., supra,* 419 N.E.2d at 162. Our First District noted that Indiana's antifraud provision parallels Rule 10b–5[12] which was promulgated under the federal Securities Exchange Act of 1934. *Id.* In *Moll,* the court concluded that an action predicated upon the antifraud statute arises when there are "allegations of facts which would support an inference of fraud, deceit, or misrepresentation." *Id.* Thus, in a private action, it would be necessary to demonstrate that Enservco made a material representation of a past or existing fact, which representation was false and was made with knowledge or reckless disregard of its falsity, causing reliance upon the representation to the detriment of the person so relying. *Id. Accord Master Abrasives, supra,* 469 N.E.2d at 1201. The question becomes what elements must be shown in administrative enforcement proceedings pursued under the antifraud provisions.

When faced with an issue of first impression, an analysis of relevant and parallel statutory schemes at the federal level is appropriate. *Matter of CTS Corporation* (1981) 2d Dist.Ind.App., 428 N.E.2d 794 (cross-referencing and construing Indiana's Business Take–Over Offers Act in light of interpretation of the federal securities law of tender offers contained in the Williams Act, 15 U.S.C. § 78n(d)(1)); *Flynn v. Klineman* (1980) 4th Dist.Ind.App., 403 N.E.2d 1117 (comparing and contrasting provisions of the "private offering" exemption of the federal Securities Exchange Act of 1934, 15 U.S.C. § 78a (1976), with the parallel provision of I.C. 23–2–1–2(b)(10) (Burns Code Ed.1976)). Reliance upon federal interpretation of parallel provisions carries with it the directive to adopt the established legal significance of key terms as well as the constructions placed upon such language or statutes. *CTS Corporation, supra,* 428 N.E.2d at 799. We take our cue from *Aaron v. Securities Exchange Commission* (1980) 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 and *S.E.C. v. MacDonald* (1983) 1st Cir., 699 F.2d 47.

---

12. Rule 10b–5 provides that:
"It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1992).

Section 10(b) of the Securities Act of 1934 is the statutory provision under which Rule 10b–5 was promulgated. Section 10(b) provides, in pertinent part, that it is "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1988).

In *Aaron*, the Securities Exchange Commission (SEC) sought preliminary and final injunctive relief enjoining future violations of the aiding and abetting provisions of the Securities Exchange Acts of 1933 and 1934. *Id.* at 684, 100 S.Ct. at 1949. The *Aaron* decision resolved a conflict in the federal courts as to whether scienter must be established as an element of an SEC enforcement proceeding to enjoin violations of the Securities Exchange Act. *Id.* at 686, 100 S.Ct. at 1950. The Supreme Court reviewed, and later rejected, that portion of the Court of Appeals' holding that "proof of negligence alone will suffice" when the Commission seeks injunctive relief under Section 10(b) and Rule 10b–5 of the Securities Exchange Act. *Id.* at 685, 100 S.Ct. at 1949.

The *Aaron* court cited, with approval, *Ernst & Ernst v. Hochfelder* (1976) 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, which held that a private cause of action under Section 10(b) and Rule 10b–5 requires an allegation of scienter [13]. *Id.* at 689–90, 100 S.Ct. at 1952. *Hochfelder* expressly reserved the question of whether scienter must be alleged in administrative actions. The Court noted that the reasoning articulated in *Hochfelder* was compelling and applicable to the issue at hand. *Id.*

The court, in *Aaron*, agreed with the rationale that Section 10(b) of the Securities Act was a catch-all clause proscribing any manipulative or deceptive device or contrivance. *Id.* at 689–91, 100 S.Ct. at 1952–53. This clearly evinced a congressional intent to graft a "knowing or intentional misconduct" requirement to all violations which contravened the rules and regulations prescribed by the SEC. *Id.* On its face, Section 10(b) seeks to deter fraudulent conduct; thus, scienter is specifically required. *Id.* On the other hand, the Court conceded that portions of Rule 10b–5 *could* [14] be read as proscribing certain types of misconduct whether intentional or not. *Id.* at 696, 100 S.Ct. at 1955.

The Court determined, however, that because the rules promulgated by the SEC must perforce reflect the "ambit of its statutory authority," Rule 10b–5 necessarily includes the scienter requirement established under Section 10(b). *Id.* at 691, 100 S.Ct. at 1952. Furthermore, the respective legislative and administrative histories clearly indicate that Section 10(b) and Rule 10b–5 were intended to address situations where intentional misconduct, i.e., fraud, arises. *Id. See also Hochfelder, supra,* 425 U.S. at 194–214, 96 S.Ct. at 1381–91. The Court concluded that when read in tandem, as must be done, a scienter requirement becomes an essential element of

---

**13.** The term "scienter", as used in the *Aaron* opinion, means "a mental state embracing intent to deceive, manipulate or defraud." *Aaron, supra,* 446 U.S. at 687, n. 5, 100 S.Ct. at 1950, n. 5.

**14.** In fact, allegations of *less than* intentional misconduct are actionable under provisions of the Securities Exchange Act that mirror the language of Rule 10b–5(b) and (c). For example, violations of § 206(2) of the Investment Advisors Act of 1940, 15 U.S.C. § 80b–6, do not require a showing of intent in light of "congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship[.]'" *Aaron, supra,* 446 U.S. at 692, 100 S.Ct. at 1953 (citing *SEC v. Capital Gains Research Bureau* (1963) 375 U.S. 180, 191–92, 84 S.Ct. 275, 282–83, 11 L.Ed.2d 237).

Similarly, actions brought against *sellers* of securities, pursuant to § 17(a)(2) and (3) of the Securities Exchange Act of 1933, 15 U.S.C. § 77q(a), do not require a "showing [of] deliberate dishonesty as a condition precedent to pro-

tecting investors." *Id.* at 697, 100 S.Ct. at 1956 (referencing *United States v. Naftalin* (1979) 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624).

These provisions and the corresponding legislative histories clearly indicate that the conduct of sellers or investment advisors is to be closely scrutinized and rigidly controlled. Thus, allegations of negligent misconduct will suffice within those contexts. However, when Congress sought to control the conduct of "any person" under a broad antifraud provision such as Section 10(b) or Rule 10b–5, intentional misconduct must be shown.

We note that Indiana's antifraud provisions are broad, reaching the misconduct of "any person." Indiana could have enacted interrelated components of a securities regulatory scheme designed to monitor the conduct of specific entities, but it chose not to do so. Insofar as Indiana's Franchise Act is inclusive and proscribes misconduct of "any person," decisions interpreting exclusive regulatory provisions, e.g., *Capital Gains, supra,* and *Naftalin, supra,* are inapposite to the instant analysis.

Rule 10b–5 violations. *Id.* at 695, 100 S.Ct. at 1955. Thus, the Court required the Securities Exchange Commission to establish scienter in administrative enforcement proceedings brought under Section 10(b) *or* Rule 10b–5. *Id.*

The *Aaron* Court also reaffirmed the SEC's role in securing injunctive relief as a means to protect present and future investors from fraudulent conduct. *Id.* at 700, 100 S.Ct. at 1957. The SEC may seek an injunction [15] when it appears that "a person 'is engaged or [is] about to engage in any acts or practices'" in contravention of the securities laws. *Id.* The SEC must show, at a minimum, that there is a substantive violation of the law, including a showing of scienter if that is an element of the violation. *Id.* The degree of scienter (or the lack thereof) is either a mitigating or aggravating factor to be considered when deciding whether an injunction is necessary. *Id.* at 701, 100 S.Ct. at 1958. The SEC must likewise demonstrate sufficient evidence that future violations may occur.[16] *Id.* In appropriate cases, the SEC is justified in seeking injunctive relief when necessary for the protection of the public interest.

In conjunction with the foregoing, the SEC may also be required to establish the element of materiality. In *S.E.C. v. MacDonald, supra,* the SEC charged that MacDonald violated the antifraud provisions of the Securities Exchange Act and Rule 10b–5 by making purchases of a real estate investment trust's stock without disclosing insider information concerning a profitable long-term lease. The SEC contended that MacDonald's nondisclosure amounted to an omission to state a material fact.

An omitted fact is *material* if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable [investor]." *MacDonald, supra,* 699 F.2d at 49 (quoting with approval *TSC Industries, Inc. v. Northway, Inc.* (1976) 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757). Disclosure of material facts, as required by Rule 10b–5, protects the public interest by allowing potential investors an opportunity to reach an informed decision. A showing of materiality underscores the importance of a companion purpose of federal securities law, i.e., full and fair disclosure. *See Securities & Exchange Commission v. Parklane Hosiery Co.* (1977) 2d Cir., 558 F.2d 1083, 1088.

In the instant case, we gauge the reach of Indiana's antifraud provisions

15. The purpose of an SEC injunction is to *deter,* rather than punish; thus, "the injunction merely requires that the law be obeyed." Marc Steinberg, *SEC And Other Permanent Injunctions—Standards For Their Imposition, Modification, And Dissolution,* 66 Cornell L.Rev. 27, 28 (1980) [hereinafter "SEC And Other Injunctions"]. Nevertheless, Steinberg notes that an SEC injunction may effectively stigmatize the subject party. *Id.* The countervailing public interests in deterring future violations, however, militate in favor of allowing injunctions to issue *provided* that there is a cognizable and recurrent danger. *Id.* at 30.

As Judge Friendly noted, "an injunction, while not always a 'drastic remedy' ... often is much more than [a] 'mild prophylactic'...." *S.E.C. v. Commonwealth Chem. Sec., Inc.* (1978) 2d Cir., 574 F.2d 90, 99 (citations omitted). Therefore, we proceed cautiously in this regard, noting that under Indiana's Franchise Act, the effect of the commissioner's cease and desist order is far-reaching. I.C. 23–2–2.5–40 provides:

"In any civil or criminal proceeding under this chapter a certificate duly signed by the commissioner showing compliance or non-compliance with this chapter respecting the franchise in question ... constitutes prima facie evidence of such compliance or such noncompliance and is admissible in evidence in any proceeding."

16. Several federal court decisions have fleshed out the relevant factors which demonstrate the reasonable likelihood of future violations. *SEC And Other Injunctions, supra,* at 33–34. Generally, courts weigh "the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur." *Id.* (quoting *SEC v. Universal Major Indus. Corp.* (1976) 2d Cir., 546 F.2d 1044, 1048) (other citations omitted). Other relevant factors might include "the gravity of the offense committed, the time elapsed between the violation and the court's decision, whether the defendant, in good faith, relied on advice of counsel, and the adverse effect an injunction would have on the defendant." *SEC And Other Injunctions, supra,* at 34 (citations omitted).

against the backdrop of the central purposes of the Franchise Act. Clearly, the Act proscribes fraud and promotes disclosure. I.C. 23–2–2.5–47. The securities regulatory scheme must be read as a whole so that its provisions are not implemented in a vacuum.[17] To fractionalize the reach and requirements of administrative enforcement action from the stated purposes of the Franchise Act erodes the legislative intent upon which the antifraud provisions were founded. Although the powers delegated to the securities division and the commissioner are broad and are to be liberally construed, enforcement actions undertaken pursuant to the antifraud provisions must of necessity reflect and advance the legislature's intent to prohibit and prevent fraud as well as to promote disclosure.

■ Based upon this clear and overriding theme, it is apparent that Indiana's antifraud provisions contemplate only those circumstances involving intentional misconduct. We accept the principle set forth in *Moll, supra,* and later confirmed in *Master Abrasives, supra,* that a private action alleging a violation of the Franchise Act's antifraud provisions must include the element of scienter. The scienter requirement is sound and must be extended and incorporated into public actions brought by the securities division or the commissioner.

■ We are persuaded, as was the Supreme Court in *Aaron, supra,* that knowing or intentional misconduct (scienter) must be established when administrative enforcement actions are pursued under a broad antifraud statute which reaches the conduct of "any person." *See supra,* n. 14. An allegation of fraudulent conduct necessarily includes proof of scienter. Further, as *MacDonald* instructs, if the antifraud allegation is based upon failure to disclose information, such facts must be material.

■ Indiana's Franchise Act empowers the commissioner to maintain a secure investment environment by pursuing administrative enforcement actions in appropriate cases. The commissioner may order injunctive relief, based upon an appropriate showing as contemplated by the federal counterpart in *Aaron, supra,* when a violation (or potential violation) of the antifraud provisions threatens the balance of public interest and private needs. In the instant administrative enforcement action brought pursuant to the antifraud provisions of I.C. 23–2–2.5–27, the Indiana Securities Commissioner must have proved that Enservco failed to disclose material facts *and* that Enservco acted with the requisite scienter.

### B. Standard of Review

■ The Indiana Securities Division and Commissioner perform the specialized tasks of interpreting and implementing Indiana's securities laws. *CTS Corporation, supra,* 428 N.E.2d at 798. Generally, we defer to agency expertise unless a decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. *CTS Corporation, supra; Clarkson v. Department of Insurance* (1981) 2d Dist.Ind.App., 425 N.E.2d 203. Even though the Administrative Orders and Procedures Act (I.C. 4–21.5–1–1 (Burns Code Ed.1990)) does not apply to proceedings under the Franchise Act, it is clear that the permissible scope of judicial review of administrative agency decisions is governed by general principles of administrative law. *Bolerjack v. Forsythe* (1984) 3d Dist.Ind.App., 461 N.E.2d 1126, 1129 (using similar standard of review as provided in the Administrative Adjudication Act (AAA), I.C. 4–22–1–1 (repealed 1986, effective July 1, 1987, presently codified at I.C. 4–21.5–1–1)). *See also Indiana Department of Public Welfare v. DeVoux* (1974) 2d Dist., 161 Ind.App. 40, 314 N.E.2d 79 (expressly adopting the AAA in a case not specifically covered by that Act).

■ Based upon the general principles of administrative law, a reviewing court is bound to accept the agency's findings of facts if supported by substantial evidence

---

**17.** Parenthetically, we note that the terms "fraud" and "deceit" are defined to include, *inter alia,* "any promise or representation or prediction as to the future not made honestly or in good faith...." I.C. 23–2–2.5–1(f). Such language, which contemplates intentional misconduct, clearly tracks the purposes of the Franchise Act.

in the record. *CTS Corporation, supra,* 428 N.E.2d at 798. Upon review, the court may not substitute its assessment of the facts for that of the administrative body. *Id.* Where, as here, the agency determination is not supported by its findings, we may not search the record to draw our own inference and make findings or draw conclusions which would support the agency result. To do so, is to invade the province and expertise of the agency. *Matter of City Investing Co.* (1980) 4th Dist.Ind. App., 411 N.E.2d 420, 433–34 (reversing a cease and desist order issued by the securities commissioner because self-contradictory inferences drawn from the evidence did not reasonably support the conclusion that the investment company made fraudulent filings in violation of Indiana's "Take–Over Offers" Act).

██ If the administrative agency's ultimate findings are not reasonably grounded upon the facts and inferences of record, then the resulting action must be set aside. *Id.* Thus, we proceed to determine whether the Commissioner's cease and desist order was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, or whether the Commissioner's conclusion that Enservco violated the antifraud provisions was supported by substantial evidence.

## II. Analysis

As set forth above, the Commissioner determined that Enservco violated the antifraud provisions in at least three respects. The Commissioner concluded that material misstatements or omissions were made concerning the EPA Test Issue, the Testing Time Issue, and the Option/First Right of Refusal Issue. Each issue is reviewed upon its individual merits.

### A. EPA Test Issue

██ The Commissioner concluded that Enservco failed to disclose a material fact that the results of EPA testing indicated that the AES system failed to meet "EPA standards." Record at 544. Enservco argues that the Commissioner's conclusion on

this issue must be set aside because there were no "EPA standards" in existence at the time Enservco entered into its franchise agreement with AES/Indiana on March 1, 1988. We agree.

The facts reveal that in May, 1987 Enservco voluntarily participated in an EPA-sponsored testing program designed to evaluate the capabilities of various underground tank testing systems. Richard Brockman, inventor of the AES system, explained that the EPA was interested in developing industry-wide guidelines against which new tank testing systems could be judged. The preliminary test results were distributed on a confidential basis in December of 1987, but the results and findings of the tank testing program were not published by the EPA until April, 1989. AES/Indiana acknowledged that, prior to signing the Agreement, Enservco notified them that Enservco had received the preliminary data in December, 1987, but the results of the test were not disclosed to AES/Indiana until after the Agreement was signed.

At the time of the EPA test, the National Fire Protection Association had developed the only standard (NFPA 329), implemented on a national basis, which measured "leak detection" rates for underground tank testing. Although the findings of the EPA test apparently prompted the formulation of new EPA standards concerning "probability of detection" rates and "probability of false alarm" rates, all parties admitted that the resulting EPA standards were not to become effective until on or about December, 1990. In fact, as of the date of the hearing in the instant case, the sole national standard applicable to underground tank testing was NFPA 329.

Clearly, Enservco represented to AES/Indiana, both orally and in writing, that the tank testing system met NFPA 329's "leak detection" rate of .05 gallons per hour. Enservco also informed AES/Indiana, prior to the signing of the Agreement, that results of the EPA test had been distributed to the test participants.[18] However, En-

18. The State contends that Enservco's partial

disclosure concerning results of the EPA test

servco did not and could not disclose that the AES system "failed" to meet EPA standards (prior to the signing of the Agreement) because no such standards existed at that time. The Commissioner's conclusion on this issue must be set aside.[19] *CTS Corporation, supra,* 428 N.E.2d 794.

### B. Testing Time Issue

■ The Commissioner concluded that Enservco failed to disclose that the tank testing times for the AES system might take longer than represented in light of climatic conditions in Indiana. Additionally, the Commissioner concluded that Enservco did not disclose that temperature changes could substantially increase the tank testing time period. These conclusions were based upon findings that, prior to entering into the Agreement, AES/Indiana observed tank testing simulations which were completed in approximately two to three hours, but AES/Indiana was not informed that different weather conditions could increase tank testing times in Indiana.[20]

We assume that the Commissioner's conclusions implicitly include a finding that Enservco failed to disclose this information with the intent to deceive, manipulate, or defraud, as required under the Indiana an-

tifraud provisions. *See, supra,* Part I–A. A scienter requirement is an essential element of an antifraud violation under Indiana's Franchise Act. Further, the State's contention that Enservco's omission to state that testing would take longer in Indiana was materially misleading must meet with the requirements of I.C. 23–2–2.5–27.

The antifraud provisions require that alleged omissions of information be viewed in light of the circumstances under which other statements of fact were made. I.C. 23–2–2.5–27(2). In the instant case, the "circumstances" relevant to the testing time issue necessarily include: the professionally-related experiences of Brent Balkema, President of AES/Indiana and formerly a geophysicist for Amoco Production Company, and of Roger Sellers, Vice President of AES/Indiana and formerly a data processing geophysicist; the total mix of testing time data collected by AES/Indiana; and the abilities of AES/Indiana's representatives to process that information in light of their appraisal of comparable state-of-the-art tank testing systems. Enservco attacks the Commissioner's conclusions upon several bases.

was misleading or, alternately, created a false impression concerning the leak detection capabilities of the AES system. Initially, we note that there is no allegation or indication that Enservco either fraudulently, dishonestly, or in bad faith denied access to or hid information from AES/Indiana concerning the EPA test results. We interpret the Commissioner's finding Number 11, Record at 353, to mean that Enservco made no disclosure that the quality of the AES system was questionable (as it is clear from the record that Enservco disclosed that it had received the test results); however, this finding, taken as true, does not translate into the conclusion that Enservco omitted to disclose that the AES system did not meet EPA standards.

More importantly, the State's contentions do not address the Commissioner's conclusion which is directed *solely* to the fact that the EPA tests "indicated that the AES tank testing equipment did not meet EPA standards." Record at 353 (Conclusion of Law, ¶ 2(a)). In point of fact, the EPA test apparently did not test the systems for NFPA 329 nor did the test results indicate that the AES system failed to meet the NFPA 329 leak detection rate. Moreover, the EPA carefully pointed out that volumetric tank

tests, such as NFPA 329, do not specify reliability in terms of "probability of detection" or "probability of false alarm," i.e., the two factors upon which the AES system apparently *received a low rating* in the EPA test. Record at 174. (*Volumetric Tank Testing: An Overview,* p. 1, EPA Publication, April, 1988). The fact is that the AES system met the standard NFPA 329 leak detection rate of .05 gallons both before *and* after the EPA test. It is difficult to imagine how "trials" conducted at an independent laboratory for the express purpose of gathering *preliminary* information for the EPA that might result in the formulation of additional probabilities standards for leak detection can lead to the Commissioner's conclusion that the AES system "failed" anything.

**19.** Having concluded that the Commissioner's ruling on this issue must be set aside, we reach no conclusion regarding the impact, if any, that a "trial de novo," as that term is used in I.C. 23–2–1–20(c) and (d), would have had upon the EPA Test Issue.

**20.** AES/Indiana rightfully claims that information concerning testing times was a material factor in their consideration of the AES system.

First, Enservco denies that any representation was made concerning the time needed to complete an underground tank test. The State's allegation of misrepresentation rests upon the fact that AES/Indiana observed tank testing procedures that took two to three hours per site in California, but that testing in Indiana averaged eight hours per site.

The evidence at the administrative hearing revealed that AES/Indiana observed several demonstrations in California as a part of Enservco's training program. Brent Balkema, President of AES/Indiana, visited five sites in San Diego County where crews from, presumably, AES of California completed field testing of underground tanks. Balkema stated that each location was a "multiple tank site," e.g., a gas station with several storage tanks, and that the testing time *per site* was three hours. Roger Sellers, Vice President of AES/Indiana, testified that "according to the demonstration we saw ... service stations tested on the order of four hours per site, on three occasions." Record at 178. Tests conducted by AES/Indiana, however, required approximately eight hours of testing at sites located in Indiana.

It would be disingenuous [21] to suggest that the conduct of AES employees cannot be construed as "representations" of tank testing times. AES apparently designed and implemented the training sessions as a means of introducing new licensees to the complexities of tank testing procedures. Michael Lessley, technical director of AES, explained that it was probably necessary for AES/Indiana to visit several sites in order to understand the testing protocols.

Enservco simply cannot disclaim responsibility for AES/Indiana's understanding of testing time requirements since those conclusions were formulated while attending AES's self-styled training sessions.[22]

Secondly, Enservco argues that even if the demonstrations were "representations," they were made after the fact and subsequent to the formation of the Indiana franchise. Clearly, if the demonstrations took place *after* the Agreement was signed, as Enservco alleges, AES/Indiana could not have relied upon this fact in reaching its decision to enter into the franchise agreement.

The evidence upon this point reveals that Roger Sellers explicitly stated that the California demonstrations occurred "prior to signing the agreement." Record at 178. Further, Don James, on behalf of Appellants, testified that contract negotiations (concerning the option/first right of refusal issue) took place "when Brent came out to sign the contract. It was during that period of time and training. . . . But to the best of my recollection, it was during that period of time, you know, March 1st." Record at 279. Taken as a whole, this testimony permits a conclusion that the training sessions were either completed prior to or contemporaneously with the signing of the Agreement.

Moreover, there is no evidence that AES/Indiana returned to California for training after the Agreement was executed. To the contrary, Michael Lessley, technical director of AES, explained that "it takes quite a few test sites before you can understand what you're doing, so when [new licensees] leave, they have to have addition-

21. Likewise, Enservco's attempt to equate a franchisee's conclusion drawn from the observations of repeated field tests *with* a franchisor's statement that its corporation was a "growth" organization, (Brief of Appellant at 35–36, citing *Vaughn v. General Foods Corp.* (1986) 7th Cir., 797 F.2d 1403, *cert. denied* 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149, in which the representation was held to be "opinion") is inefficacious.

22. This is not to say that a representation of California testing times can be inextricably linked to testing times in Indiana. There is no evidence in the record that Enservco had tested

tanks in Indiana or that Enservco had gathered information relative to Indiana's climatic conditions. The California testing times provide, at most, only a basis of comparison for the tank testing protocols that could be anticipated by AES/Indiana. Any opinions formulated by AES/Indiana subsequent to the California demonstrations can only be characterized as future predictions. Although such predictions may be actionable under I.C. 23–2–2.5–1(f) if made dishonestly or in bad faith, that conclusion cannot be drawn *solely* from the fact that Enservco demonstrated testing times using tanks in California.

al training in the field by [telephone]." Record at 259. In all probability, AES/ Indiana never made a second trip to California, but had a single training session during the time of contract negotiations. Although it impossible at this time to pinpoint the exact date of the demonstration, there is sufficient evidence and plausible inferences of record to support the Commissioner's finding that AES/Indiana did, in fact, witness the tank testing before executing the franchise agreement.

Our attention turns to whether this finding supports the conclusion that, in light of the aforementioned circumstances in the instant case, Enservco *willfully* failed to disclose that tank testing times would be increased due to Indiana's temperature and climatic conditions. We note that the testing time information available to AES/ Indiana was not limited to that which could be gleaned from the California field observations. AES/Indiana apparently reviewed various printed materials while researching the AES system. AES/Indiana admitted that they made independent investigations into AES's corporate activities prior to entering into negotiations with AES and Enservco. AES/Indiana contacted franchisees operating in New York, Arkansas, and Arizona. AES/Indiana learned that the New York franchise, which was operating in climatic conditions that, presumably, mirror those which could be anticipated in Indiana, was doing "relatively well."

In addition, Don James provided AES/ Indiana with an economic report which charted the financial data of PPT–Rocky Mountain Region and which reflected actual monthly testing activities of the mobile vans used with the AES system. A cursory examination of the data shows that AES vans tested an average of 2.5 *tanks per day* which, interestingly enough, squares with AES/Indiana's own testing experiences. The compilation of data available to AES/Indiana, i.e., the economic report and printed materials provided by Enservco, the information obtained through personal contacts with AES franchisees, *and* the on-site observations made by AES/Indiana, would have provided an overview of representative testing times for the AES system.

Thus, it appears that AES/Indiana accumulated testing time information from various sources in an effort to reach an independent business decision.

Indiana's Franchise Act requires that disclosures made by Enservco must include "sufficient and reliable information in order to afford *reasonable opportunity* for the exercise of *independent judgment....*" I.C. 23–2–2.5–47 (emphasis supplied). Even though Enservco provided a variety of methods and means through which AES/Indiana learned about the AES system, it is possible that Enservco may not have disclosed specific information about temperature or climatic conditions. Based upon the record in the instant case, however, it cannot be determined what, if any, information was in possession of Enservco concerning temperature or climatic conditions in Indiana. Neither the Commissioner nor the Marion Circuit Court could therefore conclude that Enservco failed to disclose such information and that the disclosure failure prevented or hindered the exercise of independent judgment by AES/ Indiana. Nor can the degree to which Enservco made disclosure of pertinent information be ascertained.

Although the evidence concerning the other factors relative to the testing time issue may give rise to conflicting inferences so as to justify the Commissioner's determination that Enservco failed to disclose sufficient or reliable information, such is not the case with respect to the critical element of scienter. Assuming, without deciding, that Enservco failed to make proper disclosure, this does not necessarily lead to the conclusion that Enservco *willfully* withheld information. Scienter is the crucial factor in the equation which controls resolution of the testing time issue. In any event, Enservco flatly denies that it failed to disclose tank testing time information with the intent to deceive, manipulate, or defraud.

We note that even if Enservco had failed to fully apprise AES/Indiana of facts relevant to the effect of climatic variations, there is no evidence from which the requisite scienter could be inferred. We are left

to speculate as to the extent of AES/ Indiana's inquiries about testing times or as to the clarity, depth, or earnestness of Enservco's response. No facts directly or indirectly give rise to an inference of a knowing or intentional omission by Enservco. Thus, the Commissioner's conclusion that Enservco violated the antifraud provisions due to a purposeful failure to make a disclosure concerning the testing times cannot be sustained upon the evidence of record.

As previously discussed, Indiana requires that scienter be proved in administrative enforcement actions. A violation of the antifraud provisions cannot be supported by mere speculation upon this element. We hold that the Commissioner's Conclusion of Law of the Testing Time Issue must be set aside.

C. Option/First Right of Refusal Issue

 The Commissioner concluded that Enservco's revocation of an "option or first right of refusal"[23] constituted a fraud upon AES/Indiana. Record at 544. The Commissioner also concluded that the option/first right of refusal was a material fact upon which AES/Indiana relied when entering into the franchise.[24] As a premise, the Commissioner found that the parties discussed the possibility of an option/first right of refusal. Enservco promised that AES/Indiana could acquire license agreements for several midwestern states, but subsequently refused to allow AES/Indiana to pursue licensing for the State of Ohio.

In the instant case, the record reveals that Enservco and AES/Indiana discussed possible expansion to states surrounding Indiana prior to entering into the franchise agreement. According to the Agreement, however, no mention is made of territorial assignments other than AES/Indiana's exclusive right to operate in Indiana. After the Agreement was signed, Enservco sent a follow-up letter confirming that additional territories would be made available to AES/Indiana. AES/Indiana submitted a written proposal for licensing in Ohio, Illinois, Kentucky, and a portion of Michigan, but refused to accept a counter-offer presented by Enservco. During this period of time, Enservco stated that Ohio was unavailable for licensing because AES intended to commence its own operations there. Eventually, Enservco rejected AES/ Indiana's final offer to acquire territories in Ohio, Illinois, Kentucky, and Michigan.

Enservco argues that the option/first right of refusal is only a promise to do something in the future and cannot constitute a representation of a fact. The crux of this argument, we presume, is that the option/first right of refusal could not have assumed any significance in AES/Indiana's deliberations, as *MacDonald, supra*, requires. It is obvious from a reading of both the letters and a review of the the the testimony that neither party had a clear understanding of the "facts" concerning the availability of or the terms of the acquisition of the contiguous territories. This is not to say that AES/Indiana could not have considered the potential for corporate expansion to be a material fact in reaching its decision to enter into the franchise agree-

---

23. The alleged "option/first right of refusal" centered upon an oral "understanding" that was made on or about the time of the signing of the Agreement, and later memorialized by letter. Enservco purportedly gave AES/Indiana the opportunity to acquire additional licenses to operate the AES system in Michigan, Ohio, Illinois, and Kentucky.

There is a great deal of confusion regarding the parties' understanding of the meaning of an "option" or a "first right of refusal" as well as a total lack of agreement as to the actual terms of the purchase arrangements. Our analysis of this issue does not turn upon legal distinctions between "options" and "first rights of refusal;" nor do we consider whether the terms of the

arrangement are open, conflicting, or otherwise fail to represent the parties' intentions. Suffice it to say that Enservco represented that AES/ Indiana could, at some point in the future, acquire an AES system license to use in states other than Indiana.

24. The Commissioner's Order does not contain a finding that AES/Indiana considered the option/first right of refusal *material*. Materiality is a critical factor in this Issue and should have been so noted as a separate finding based upon the facts of this case. Despite this obvious deficiency, we proceed upon the theory that the Commissioner's conclusion included materiality.

ment. No doubt the possibility of expanding the AES system into territories heretofore untapped would appeal to a reasonable investor or, for that matter, a shrewd promoter.

In the instant case, AES/Indiana testified that the option/first right of refusal was a significant factor in its decision to enter into the franchise agreement. The fact that the option/first right of refusal can be characterized as "speculative" does not negate its materiality. Speculation is part and parcel of the investor's calculus since an investor deals more often in terms of expectations rather than certainties. *S.E.C. v. Texas Gulf Sulphur Co.* (1968) 2d Cir., 401 F.2d 833, *cert. denied* (1969) 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756.

In *MacDonald, supra,* the court, in reviewing a stock purchase based upon insider information, rejected the defendant's claim that since a lucrative commercial lease was not a "sure thing," it could not have been material. *MacDonald, supra,* 699 F.2d at 50. The court noted that when dealing with speculative investment opportunities "[t]he materiality of facts regarding a contingent future event is simply a function of the anticipated magnitude of the event if it occurs, discounted by the probability of its occurring." *Id.*

Here, even if the option/first right of refusal were only a proverbial "carrot on a stick," AES/Indiana could have considered it a material part of the total mix of information available when entering into a franchise relationship. This does not end the inquiry. Under the Franchise Act, "fraud" includes "any promise or representation or prediction as to the future not made honestly or in good faith". I.C. 23–2–2.5–1(f). A finding of materiality does not lead to the conclusion that Enservco acted dishonestly or in bad faith upon offering the option/first right of refusal if, in fact, such offer was made.

At oral argument, the State pointed out that the close proximity of Enservco's revocation indicates that Enservco never intended to extend the territorial options to AES/Indiana. Although appealing at first blush, the facts do not support this proposi-

tion. To the contrary, Enservco demonstrated a measure of good faith by reducing to a writing the oral discussions concerning the opportunity for corporate expansion. In fact, Enservco extended the option/first right of refusal for 180 days from the date of the July confirmation letter rather than, as had been originally contemplated, from the date of the March license agreement. The parties proceeded in good faith by communicating several proposals regarding territories, downpayments, and financing requirements. The inability to pursue future license arrangements is more likely a by-product of an unprofitable business relationship rather than unsavory business practices.

The facts reflect that the pre-Agreement discussions were both preliminary and exploratory *and* that the terms of future license agreements were unsettled or, at the very least, unclear to *both* parties. The tentative nature of the option/right of first refusal would certainly have impacted upon AES/Indiana's exercise of independent judgment. We cannot conclude that Enservco devised a scheme of illusory expansion opportunities for the purpose of luring AES/Indiana into signing an Indiana franchise agreement. Therefore, the Commissioner's conclusion that Enservco's revocation of the option/right of first refusal violated the antifraud provisions must be set aside.

### III. Conclusion

The Commissioner exercised the administrative enforcement mechanism of the Franchise Act by seeking to enjoin franchise abuses. The remedy of injunctive relief is a powerful deterrent which ultimately protects franchisees by preventing fraud and promoting disclosure. The Commissioner's actions in the instant case, however, must be set aside.

The record does not support the Commissioner's conclusion that Enservco failed to disclose that the AES system did not meet EPA standards. Further, although there is sufficient evidence to prove the materiality of the Testing Time and Option/First Right of Refusal Issues, the record is devoid of facts or reasonable inferences upon which

it can be concluded that Enservco acted with the requisite scienter or with bad faith. We cannot conclude that Enservco violated the antifraud provisions of the Indiana Franchise Act. Because revocation of Enservco's exempt status under I.C. 23–2–2.5–3 does not appear to be founded upon any ground other than the aforementioned allegations of antifraud violations, that revocation must also be set aside.

We reverse the trial court's affirmance of the Commissioner's Order and remand with instructions that the Commissioner set aside his Order which adjudged that Appellants violated the Franchise Act and which revoked Appellants' exemption from franchise registration.[25]

SHARPNACK, C.J., and SHIELDS, J., concur.

---

25. To the extent that the Commissioner assessed the costs of the administrative action in the amount of $1,075.00 against Enservco, that portion of the Order is affirmed. I.C. 23–2–2.5–42; 23–2–1–16(d) (Burns Code Ed.1989).