In the Matter of CTS CORPORATION and Dynamics Corporation of America.

**CTS CORPORATION, Appellant,**

v.

**Stephen M. COONS, Securities Commissioner of the State of Indiana, and Dynamics Corporation of America, Appellees.**

Nos. 2–1280–A–430, 2–181–A–27.

Court of Appeals of Indiana,
Second District.

Dec. 2, 1981.

Stephen C. Sandels, Gary L. Prior, McDermott, Will & Emery, Chicago, Richard E. Deer, James A. Strain, Claudia V. Swhier, Renee R. Mawhinney, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for appellant CTS Corp.

Linley E. Pearson, Atty. Gen., Eric M. Cavanaugh, Deputy Atty. Gen., Indianapolis, for appellee Stephen M. Coons, Securities Commissioner of the State of Indiana.

Ambrose Doskow, Joseph Zuckerman, Naomi G. Litvin, Rosenman, Colin, Freund, Lewis & Cohen, New York City, Richard J. Darko, Bayh, Tabbert & Capehart, Indianapolis, for appellee Dynamics Corp. of America.

BUCHANAN, Chief Judge.

## CASE SUMMARY

CTS Corporation (CTS) appeals from the determination of the Securities Commissioner of the State of Indiana (Commissioner) that Dynamics Corporation of America (DCA) had not engaged in any act or practice constituting a violation of the Indiana Business Take-Over Offers Act (I.C. 23–2– 3–1 et seq.) with respect to DCA's acquisition of CTS stock, claiming, *inter alia*, that the Commissioner's conclusion is not supported by the evidence and is contrary to law, and that the Commissioner erred in refusing to reopen the record to receive additional evidence.

We affirm.

## FACTS

The facts most favorable to the determination of the Commissioner are as follows:

CTS is an Indiana corporation with its principal place of business located in Elkhart. CTS manufactures electronic components. DCA is a corporation chartered by the state of New York, with its principal place of business in Greenwich, Connecticut. DCA deals in air distribution and environmental equipment, fabricated metal products, and electronics equipment.

CTS is a publicly held corporation, with about 4,392,153 outstanding shares of common stock which are traded on the New York Stock Exchange. Commencing August 8, 1980, DCA started buying CTS stock. By November 6, 1980, DCA held 455,400 shares of CTS, or 10.37% of the outstanding stock. The purchases of the stock were made in the following amounts through the following brokers:

| | |
|---|---|
| Merrill, Lynch, Pierce, Fenner & Smith | 5,000 |
| Paine, Webber, Jackson & Curtis | 4,700 |
| Hertzfeld & Stern | 7,500 |
| Mosely, Hallgarten, Estabrook & Weeden | 30,000 |
| A. G. Becker, Inc. | 45,100 |
| Dean Witter Reynolds | 142,400 |
| Jefferies & Co. | 220,700 |

During the period in question, DCA corporate officers made the decisions as to whether to buy CTS stock offered to their corporation by the various brokers listed above. Such decisions were based upon a number of factors, including market forecasts, the price of a given offering, the size of a given offering, and DCA's cash or credit situation.

By October 13, 1980 DCA had acquired enough CTS stock to necessitate the filing

of a Schedule 13D pursuant to federal law.[1] In that statement DCA asserted that it "may wish to acquire CTS or control of CTS," and that it "expects to acquire additional shares of CTS stock in the future through open market or privately negotiated transactions." (Commissioner's Finding of Fact Number 28).

Before the market opened on October 13, CTS issued a press release which was carried on the wire services. It stated that CTS had been informed of DCA's planned filing of the Schedule 13D, and that CTS would "determine whether any action by CTS is required or advisable" after receipt and review of the Schedule. (*R.* Vol. V at 2714.) Additionally, at about this time the *Elkhart Truth*, a local newspaper, carried articles alluding to the possibility to a tender offer being made for CTS stock.

In response to the CTS press release run earlier in the day of October 13, DCA issued a press release announcing that it had in fact filed a Schedule 13D and substantially re-iterated the portion of the Schedule stating DCA's intentions: "DCA may in the future wish to acquire CTS or control of CTS but it has no present intention of doing either." (*R.* Vol. IV at 1980–81.)

On October 15, 1980 CTS issued a press release stating that the purchase by DCA of 7.9% of CTS's stock "is not in the best interest of CTS and its shareholders." (*R.* Vol. IV at 1783.) DCA responded the following day with a press release stating that it would continue to purchase CTS stock when market conditions were favorable, and reaffirmed the statements made in its Schedule 13D and earlier press release: "We're standing by everything we said earlier this week." (*R.* Vol. V at 2650.)

On October 17, 1980 CTS issued a release stating that the Indiana Securities Commissioner had issued a cease and desist order prohibiting further purchases by DCA of CTS stock until DCA complied with the requirements of the Indiana Business Take-Over Act, and also announced CTS's filing of a federal suit against DCA in the Northern District of Indiana.

On October 24, 1980, DCA filed Amendment Number 1 to its Schedule 13D, reflecting DCA's acquisition of 97,100 additional shares of CTS stock.

Despite the Commissioner's *ex parte* cease and desist order issued October 16, 1980, DCA, on the advice of legal counsel, continued to purchase CTS stock. *City Investing Co. v. Simcox* (7th Cir. 1980) 633 F.2d 56 was handed down on October 17, 1980. In that case, the Seventh Circuit held that the issuance, by the Commissioner, of *ex parte* orders violates the Indiana Take-Over Act's "explicit prohibition against such action." *Id.* at 58. The Commissioner, on November 10, 1980, followed *Simcox, supra,* and vacated the October 16 cease and desist order. (*R.* Vol. III at 1058.)

A hearing was held before the Commissioner on November 10 and 11, 1980. CTS and DCA both presented extensive evidence regarding their conduct. Much of the hearing and a great deal of CTS's subsequent appellate argument focuses on the actions of Jefferies & Co. (Jefferies), a broker

---

1. Section 13(d) of the Securities and [sic] Exchange Act, 15 U.S.C. 78m(d), states in pertinent part: (d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors.

The following subparagraphs require information as to the identity of the purchasers, the source of funds, any plans affecting the structure of the corporation if the purpose of the purchases is to acquire control, the number of shares beneficially owned, and information as to any contracts, arrangements or understandings with any person with respect to any securities of the issuer. Amendments must be filed if any material change occurs in the facts set forth.

*Matter of City Investing Co.,* (1980) Ind.App. 411 N.E.2d 420, 423, fn. 1.

through whom DCA acquired about half of the CTS stock it possessed at the time of the hearing. CTS sought to establish that the conduct of Jefferies personnel in offering to buy relatively large blocks of CTS stock from various investors, coupled with DCA's generally acquisitive course of conduct, constituted a "creeping tender offer," and was thus violative of the Indiana Business Take-Over Act.

In support of his Conclusions of Law the Commissioner made detailed findings of fact, setting forth much of the activity occurring within the DCA and CTS corporate structures, as well as the actions of Jefferies in attempting to supply DCA with CTS stock. Because the findings are detailed and voluminous, we do not reproduce them here. Based upon the findings of fact, the Commissioner entered the following Conclusions of Law and Final Order:

## CONCLUSIONS OF LAW

1. The Commissioner has jurisdiction over the subject matter of this controversy pursuant to the provisions of the Act, Ind.Code § 23–2–3–1 *et seq.*

2. CTS is a "target company" as that term is defined in Section 1(j) of the Act.

3. Although Jefferies was a special agent of DCA for the purpose of consumating [sic] DCA's purchase of four blocks of stock, Jefferies has not been shown to be a general agent for DCA.

4. Jefferies and DCA are not "associates" of one another within the meaning of Section 1(b) of the Act.

5. There has been no takeover offer by DCA or Jefferies for the following reasons, *inter alia:*

(a) There was no active and widespread solicitation of public shareholders;

(b) Terms of the offer were negotiable and not firm;

(c) The offer was not contingent on the tender of a fixed minimum number of shares;

(d) The offer was not open for only a limited period of time;

(e) Offerees were not subjected to pressure to sell their stock.

6. The attached final order is in the public interest.

## FINAL ORDER

The above-entitled matter came before the Commissioner at a hearing held November 10th and 11th, 1980, pursuant to the Commissioner's order.

Having found that it does not appear that Dynamics Corporation of America has engaged in any act or practice constituting a violation of the Indiana Business Takeover Act, I.C. 23–2–3–1, the Commissioner now

ORDERS THAT this matter be and is hereby dismissed.

(*R.* Vol. II at 912–20.)

On December 10, 1980, CTS filed a Petition To Vacate Order and Decision Reopen Record to Receive Newly-Discovered Evidence, and Reconsider Order and Decision. Essentially, CTS requested that the Commissioner receive into evidence depositions taken from various persons in the course of the federal case initiated by CTS in the Northern District of Indiana.

The Commissioner denied CTS's petition to reopen the record, concluding, *inter alia,* that although the proffered evidence was relevant and "worthy of credit," it was cumulative of other evidence presented, "for the most part impeaching," and had *not* been discovered by CTS since the date of the hearing before the Commissioner. The Commissioner also concluded that the admission of the "new" evidence submitted by CTS would not produce a different result. The order denying the petition to reopen the record was entered on January 22, 1981.

CTS appeals the foregoing determinations, and presents these issues for review:

## ISSUES

1. Is the Commissioner's conclusion of law that "there has been no take-over offer by DCA or Jefferies" supported by the evidence and in accord with law?

2. Is the Commissioner's conclusion of law that "Jefferies has not been shown to be a general agent for DCA" supported by the evidence and in accord with law?

3. Is the Commissioner's conclusion of law that Jefferies and DCA are not "associates of one another within the meaning of Section 1(b) of the Act" supported by evidence and in accord with law?

4. Did the Commissioner abuse his discretion in refusing to reopen the record to admit CTS's proffered evidence?

## DECISION

ISSUE ONE—Is the Commissioner's conclusion of law that "there has been no take-over offer by DCA or Jefferies" supported by evidence and in accord with law?

PARTIES' CONTENTIONS—CTS claims that the Commissioner erred in concluding that a take-over attempt by DCA was not under way, and in support of that assertion argues at length regarding the evidence presented at the hearing and presents to this court interpretations of that evidence which lead to the conclusion that a take-over has been attempted by DCA.

DCA and the Commissioner respond that principles of appellate review and deference to the expertise of specialized administrative agencies require that we not re-weigh the evidence, but affirm the determination of the Commissioner if there is evidence in the record supporting it. In support of their position, they direct us to evidence upon which the Commissioner's determination is based.

CONCLUSION—The Commissioner's conclusion that "there has been no take-over offer by DCA or Jefferies" is supported by evidence and is not contrary to law.

2. Although not argued by the parties, we conclude that in finding as he did the Commissioner could rely on I.C. 23–2–3–1(i)(1) and (6). They vest in the Commissioner the discretion to determine that even though more than 10% of the stock of a corporation has been acquired

The ultimate question in this case is whether there is a "creeping tender offer" stealthily rising to the level of a take-over offer as that term is defined in IC 23–2–3–1(i).[2] If such it be, then the provisions of the Indiana Business Take-Over Act apply with the attendant requirements for filing a disclosure statement and any applicable penalties for violations of the Act. The parties favor us with detailed argument going to the relationship between DCA and Jefferies (Issues Two and Three, *infra*), but our affirmance of the Commissioner's conclusion that there was simply no take-over offer by DCA or Jefferies abrogates the necessity for us to explore their relationship. If there has been no misconduct, our inquiry ceases.

■ This case is an appeal from the administrative agency charged with the interpretation and implementation of Indiana securities laws. As such, its specialized function requires that we defer to its expertise. *Department of Financial Institutions v. State Bank of Lizton*, (1969) 253 Ind. 172, 252 N.E.2d 248. When reviewing an administrative order, we are bound to accept the facts as found by the agency if supported by the evidence. *City of Mishawaka v. Stewart*, (1974) 261 Ind. 670, 310 N.E.2d 65. We cannot substitute our judgment for that of the administrative body. *Department of Financial Institutions v. Colonial Bank & Trust Co.*, (1978) Ind.App., 375 N.E.2d 285.

In determining guidelines to be used in construing the Indiana Business Take-Over Act, the similarity between our Act and the Federal Williams Act was commented on in an excellent analysis by Judge Young of the developing law of tender offers:

An examination of the Williams Act, 15 U.S.C. § 78n(d)(1) discloses the source of the language used in the Indiana Act. That section regulates

(*See* I.C. 23–2–3–1(i)) a "take-over offer" does not exist if the acquisition was effected through a broker-dealer in the ordinary course of his business, or if the offer was not made for the purpose of, or with the effect of, changing control of the target company.

[U]se of the mails or . . . any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *to make a tender offer for, or a request or invitation for tenders of,* any class of any equity security which is registered pursuant to section 78e of this title . . . . (Emphasis added).

We note that historically the term "takeover bid" was used to describe conventional tender offers when used as takeover devices. *See Smallwood v. Pearl Brewing Company,* (5th Cir. 1974) 489 F.2d 579, *cert. denied* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113. *See also* Report of the Committee on Interstate and Foreign Commerce of the House of Representatives, 2 U.S.Code Cong. & Admin. News, p. 2811 (90th Cong.2d Sess. 1968) recommending the enactment of the Senate Bill which was to become the Williams Act tender offer provisions and referring to a cash tender offer as "alternatively called a takeover bid."

*Matter of City Investing Co.,* (1980) Ind. App., 411 N.E.2d 420, 426–27 (transfer denied Mar. 4, 1981) (footnote omitted).

■ It appears we may rely upon the considerable body of law interpreting the Williams Act:

Where a term has an established legal significance it is presumed that legislators intended the same significance to attach by use of that term, absent any indications to the contrary. Thus, it is presumed that when language or statutes are adopted from another state or country, constructions placed on such language or statutes are adopted as well. This has long been accepted in Indiana. *See Clark v. Jeffersonville M. & I. R. Co.,* (1873) 44 Ind. 248, *Jenson v. Pritchard,* (1950) 120 Ind.App. 439, 90 N.E.2d 518, *reh. denied* 91 N.E.2d 846.

*Id.* at 427.

■ Examining the "conclusions of law"[3] entered by the Commissioner we see they include the following:

5. There has been no takeover offer by DCA or Jefferies for the following reasons, *inter alia* :

(a) There was no active and widespread solicitation of public shareholders;

(b) Terms of the offer were negotiable and not firm;

(c) The offer was not contingent on the tender of a fixed minimum number of shares;

(d) The offer was not open for only a limited period of time;

(e) Offerees were not subjected to pressure to sell their stock.

The Commissioner was obviously following well-established law in this area. Because "[t]he purpose of the Williams Act tender offer provisions is to insure that shareholders faced with a tender offer are not required to respond without adequate information regarding the quality and intentions of the offeror and without the target management's having had an opportunity to express and explain its position," *City Investing, supra,* at 427–28, and because "[t]he failure of Congress and the Securities Exchange Commission to provide a definition of a tender offer has been held to indicate an intent to allow case-by-case development and liberal interpretations so as to give effect to the broad remedial purposes of the Act," *Id.* at 428, the Commissioner evaluated CTS's claims in terms of eight factors used by the Securities Exchange Commission which focus upon the presence or absence of the substantive evils the Act is intended to prevent. Chief among these is pressuring "shareholders into making uninformed, ill-considered decisions to sell." *Note, The Developing Meaning of "Tender Offers",* 86 Harv.L.Rev. 1281.

These eight factors are:

1. Active and widespread solicitation of public shareholders;

2. Solicitation of a substantial percentage of issuer's stock;

3. Premium price;

---

**3.** We recognize that findings of fact and conclusions of law have been intermingled by the Commissioner, but this flaw is not fatal; they are not clearly erroneous. T.R. 61.

4. Non-negotiable terms;

5. Offer contingent on the tender of a minimum number of shares and, perhaps, a maximum number to be purchased;

6. Limited time in which to tender;

7. Pressure from the offeror to tender stocks; and

8. Public announcements of the offeror's intention to purchase the target company's shares preceding or accompanying rapid accumulation of large amounts of target company securities.

Note, Private Solitications Under the Williams Act, 66 Cornell L.Rev. 361, at 372.

Although criticized by some commentators, see e. g., Id., supra, and courts, see e. g. Brascan Ltd. v. Edper Equities Ltd., (S.D.N.Y.1979) 477 F.Supp. 733, the factors are widely used in the analysis of tender offer problems, and have been used in Indiana. City Investing, supra. The eight factor test is a tool intended to insure a correct determination of whether there has been conduct "likely to pressure shareholders into making uninformed, ill-considered decisions to sell." Id. at 428.

In urging us to find that there was a tender offer in this case, CTS beckons us into the quicksands of factual redetermination. This appeal is from a negative decision and we can only reverse if there is no factual basis whatsoever for the decision (reasonable men could only conclude otherwise). Metropolitan Development Comm. of Marion County v. Waffle House, Inc., (1981) Ind.App., 424 N.E.2d 184, 186.

The Commissioner found, as one of the reasons supporting his conclusion that there had been no tender offer, that "there was no active and widespread solicitation of public shareholders." (Conclusion of Law 5(a).) In support thereof are findings of fact that Jefferies personnel contacted five private shareholders and four institutional shareholders inquiring about the availability of CTS stock. (Findings of Fact 10–15,

26, 27.) Given the fact that, as noted in the Commissioner's Opinion, (issued concurrently with his findings and conclusions in this case) courts have refused to find "widespread solicitation" when 30 to 50 shareholders were contacted, we cannot say that the Commissioner's conclusion was erroneous as a matter of law. Because CTS "does not take issue with the Indiana Securities Commissioner's basic findings of fact" (Appellant's reply brief at 1) and because, in any event, we have not been shown that the factual findings are erroneous, we cannot say that the Commissioner's conclusion that there was no widespread solicitation was error.

The Commissioner also found that "terms of the offer were negotiable and not firm." (Conclusion of Law 5(b).) This finding is amply supported by evidence of DCA's negotiation regarding a number of transactions. In some cases a bargain was struck, in others DCA declined to buy at the offered price. (Findings of Facts 7, 20.) Nowhere is there evidence of a "firm offer" by DCA. This finding also is not error.

Conclusion of Law 5(c) states "[t]he offer was not contingent on the tender of a fixed minimum number of shares;" 5(d) states "[t]he offer was not open for only a limited period of time." CTS couches its argument against these findings in terms of a criticism of the Commissioner's "mechanistic approach to the determination of whether there was a 'tender offer.'" (Appellant's brief at 264). Factually, these conclusions are fully supported. Nowhere in any statement did DCA state any intent to acquire a specific number of shares, nor limit the time of its purchases.[4] The statement in its Schedule 13D that DCA "expects to acquire additional shares of CTS in the future" contains nothing remotely resembling conditions regarding the amount of stock to be purchased or a time element for purchases.

The final conclusion supporting the Commissioner's ultimate conclusion that there had been no take-over offer is that "[o]ffer-

---

4. Finding of Fact number 5 states that as of November 11, 1980, DCA still intended to buy CTS stock.

ees were not subjected to pressure to sell their stock." (Conclusion of Law 5(e).) This court has previously had occasion to consider what constitutes "pressure" upon shareholders. In *City Investing, supra*, "the Schedule 13D contain[ed] no spur to sell except the fact of a buyer interested in an extremely large percentage of stock." *Id.* at 431. Just as in *City Investing*, the statements contain "nothing to indicate to shareholders that they must sell quickly or lose the opportunity." *Id.*, DCA's Schedule 13D and subsequent communications consistently stated that DCA intended to continue purchases of CTS stock, depending on market conditions. The record discloses that although Jefferies contacted some CTS shareholders to inquire whether they would sell their stock, the persons so contacted were not given ultimatums or coerced. *See, City Investing, supra.*

Mechanistically or not, the Commissioner correctly found that five of the eight commonly used criteria were not present in this case and therefore did not apply. In his discretion he weighed the relevant factors and discarded as not solely determinative the three factors emphasized by CTS: (1) "[S]olicitation of a substantial percentage of issuer's stock;" (2) offers of payment of a "premium price;" and (3) public announcements of DCA's intention to purchase CTS shares preceding or accompanying rapid accumulation of large amounts of CTS stock.

In this case the only factor unequivocally present is the fact that DCA solicited a substantial percentage of CTS stock. The record supports the Commissioner's statement that in his opinion the only CTS stock on which DCA paid a premium was a 164,500 share block purchased through Jefferies on October 3, 1980. Given the size of that block, the Commissioner stated that such a transaction "may be expected to command a premium in the absence of a tender offer." All other purchases of CTS stock were made at the market price. Finally, as to the Commissioner's findings regarding public announcements of the purchasing program, although DCA did engage in publicity regarding its plans, it is significant that the initial communication of October 13 originated from CTS, and that for a short time the two companies conducted a dialogue over the wire services regarding the events in the marketplace. DCA was not alone in its publicity efforts.

Having concluded that the Commissioner committed no errors of law in formulating his conclusions, we cannot interfere with his ultimate conclusion that there was no tender offer made.

ISSUES TWO AND THREE—Is the Commissioner's conclusion of law that "Jefferies has not been shown to be a general agent for DCA" supported by the evidence and in accord with law?

Is the Commissioner's conclusion of law that Jefferies and DCA are not "associates of one another within the meaning of Section 1(b) of the Act" supported by the evidence and in accord with law?

CONCLUSION—Having determined that the Commissioner correctly decided that there was no take-over offer, we need not address these issues going to the relationship between DCA and Jefferies as to do so would have no legal effect and is not necessary for the resolution of this case.

ISSUE FOUR—Did the Commissioner abuse his discretion in refusing to reopen the record to admit CTS's proferred evidence?

PARTIES' CONTENTIONS—CTS claims that in deciding not to reopen the record to receive additional evidence, the Commissioner applied an incorrect standard—that applicable to civil tort actions where there is no continuing harm. CTS also questions the Commissioner's determinations that the evidence had *not* been discovered since the date of the hearing, that the proferred evidence was cumulative of other evidence and for the most part impeaching, that only a portion of the proferred evidence could be produced upon a rehearing, and that the presence of the proferred evidence in the record would not produce a different result.

DCA and the Commissioner respond that by the terms of both the Indiana Administrative Adjudication Act and the Business

Take-Over Act the proper standard was applied, and that the Commissioner acted within the scope of his discretion in ruling as he did.

CONCLUSION—The Commissioner did not abuse his discretion in refusing to reopen the record.

■ CTS's argument that the Commissioner erred in the standard to be applied in considering whether to reopen the record is contradicted by the express terms of the applicable statutes. I.C. 23–2–3–11, the appeals section of the Indiana Business Take-Over Act states that appeals under the Act shall be "under the same terms and conditions as govern appeals in ordinary civil actions." Even more explicit is I.C. 4–22–1–15, the portion of the Administrative Adjudication Act dealing with the admission of newly discovered evidence. In pertinent part, it states that "[b]y newly discovered evidence is meant evidence newly discovered *after* the time of the hearing before the agency . . . and which meets the requirements of newly discovered evidence as grounds for a new trial in civil causes." (Emphasis added).

The statutes thus incorporate by reference the oft-stated law regarding the admission of newly discovered evidence:

A motion for a new trial based on newly discovered evidence should be received with great caution and the alleged evidence should be carefully scrutinized. The newly discovered evidence must be material, and must be more than just cumulative or impeaching. The party seeking a new trial because of newly discovered evidence must show that the evidence is such that it could not have been discovered before the trial by the exercise of due diligence, and must show that the evidence is such that it would reasonably and probably result in a different verdict. The granting of a new trial because of newly discovered evidence is a matter which rests within the sound discretion of the trial court, whose decision will be disturbed only for a manifest abuse thereof.

*Kelly v. Bunch,* (1972) 153 Ind.App. 407, 287 N.E.2d 586, 588–89. "There is a strong presumption that the alleged evidence might have been discovered in time to use at trial." *Shaw v. Shaw,* (1973) 159 Ind. App. 33, 304 N.E.2d 536, 541. The discretion of the trial court in deciding whether or not to admit newly discovered evidence is so great that the decision to admit has been described as a question of fact, not law. *Montgomery Ward and Company v. Thalman,* (1950) 120 Ind.App. 473, 93 N.E.2d 352.

In this case, the depositions containing the evidence in question were taken between November 25 and December 5, 1980. The hearing before the Commissioner was November 10 and 11, 1980. By finding that the *evidence* was not discovered since the date of the hearing, the Commissioner was referring to the information contained in the depositions, rather than the depositions themselves. The depositions here were merely new recitations of evidence which existed and was known to the parties at the time of the hearing. *See also, Shaw, supra,* for the proposition that there is a strong presumption that the evidence might have been discovered in time for trial.

Having reviewed the depositions, we cannot say that the Commissioner erred in entering the negative decision denying CTS's request to reopen the record. As stated by the Commissioner, the information contained in the depositions was primarily cumulative of evidence presented at the hearing. The judgment involved in the Commissioner's determination that the depositions did not contain dispositive evidence which would lead to a decision different from that which was entered is entitled to great deference. *Shaw, Kelly, Thalman, City of Mishawaka, State Bank of Lizton, supra.* So again we refuse to re-weigh the evidence and affirm the decision of the Commissioner with regard to reopening the record in this case.

Having been shown no error on the part of the Commissioner, his order of November 25, 1980 dismissing CTS's action against DCA is

AFFIRMED.

SHIELDS and SULLIVAN, JJ., concur.