**CITIZENS ACTION COALITION OF INDIANA, INC., Save The Valley, Inc., Valley Watch, Inc. and Sierra Club, Inc., Appellants–Intervenors,**

v.

**PSI ENERGY, INC., d/b/a Duke Energy Indiana, Inc.; Indiana Office of Utility Consumer Counselor; Nucor Steel; Indiana Industrial Group; Clean Air Task Force; Indiana Wildlife Federation; and Indiana Coal Council, Inc., Appellees–Respondents.**

No. 93A02–0712–EX–1093.

Court of Appeals of Indiana.

Oct. 16, 2008.

Rehearing Denied Dec. 17, 2008.

Jerome E. Polk, Polk & Associates, Indianapolis, IN, Attorney for Appellant.

Jon B. Laramore, James R. Pope, Elizabeth A. Herriman, Baker & Daniels, Indianapolis, J. William Dumond, Kelley A. Karn, Duke Energy Business Services, Plainfield, IN, Attorneys for Appellee, Duke Energy Indiana, Inc.

Robert L. Hartley, Carrie G. Doehrmann, Maggie L. Smith, Locke Reynolds Indianapolis, IN, Attorneys for Appellee, Clean Air Task Force and Indiana Wildlife Federation.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Solicitor General of Indiana, Heather L. Hagan, Deputy Attorney General, Stanley C. Fickle, Barnes & Thornburg, Indianapolis, IN, Amicus Curiae.

## OPINION

BROWN, Judge.

Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Valley Watch, Inc., and Sierra Club, Inc., (collectively, "Appellants") appeal the Indiana Utility Regulatory Commission's grant of a peti-

tion filed by PSI Energy, Inc., d/b/a Duke Energy Indiana, Inc. ("Duke") for the construction of a powerplant.[1] Appellants raise four issues, which we revise and restate as:

I. Whether the Commission erred by denying Appellants' request to reopen the record;

II. Whether the applicable statutes allow Duke to recover costs while the facility is under construction;

III. Whether the Commission adequately considered all known costs and estimates of future costs of the plant; and

IV. Whether Ind.Code §§ 8-1-8.5, Ind.Code §§ 8-1-8.7, and Ind. Code §§ 8-1-8.8 violate the Commerce Clause because the statutes express a preference for Indiana coal.

We affirm.

The relevant facts follow. On September 7, 2006, Duke and Southern Indiana Gas and Electric Company, d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren") filed a petition with the Commission seeking approval to build an integrated gasification combined cycle ("IGCC")

electric powerplant at Duke's Edwardsport facility in Knox County, Indiana. Duke operated a coal and oil-fired generating station at the Edwardsport facility that had a total of 160 megawatt capacity, was placed in service between 1944 and 1951, and was nearing the end of its useful economic life. The proposed IGCC facility would have a 630 megawatt capacity. An IGCC generating facility converts coal into synthesis gas, which is used to fuel highly efficient combustion turbines. The IGCC technology is a cleaner and more efficient way of producing electricity than conventional coal-fired plants.

Before constructing an electric generating facility in Indiana, public utilities must obtain a Certificate of Public Convenience and Necessity under Ind.Code §§ 8-1-8.5. Additionally, under Ind.Code §§ 8-1-8.7, a public utility may not use clean coal technology, such as IGCC, at a new or existing facility without obtaining a Certificate of Public Convenience and Necessity. Duke's petition also sought, in part, to obtain certain financial incentives authorized under Ind.Code §§ 8-1-8.8 for a clean coal and energy project,[2] such as "[t]he

---

1. The Clean Air Task Force and the Indiana Wildlife Federation, intervenors below, filed an appellees' brief in support of the Commission's order. The State of Indiana submitted an amicus curiae brief in support of the Commission's order, and Indianapolis Power & Light Company ("IPL"), Vectren, and the Board of Directors for Utilities of the Department of Public Utilities of the City of Indianapolis, as Successor Trustee of a Public Charitable Trust, d/b/a/ Citizens Gas & Coke Utility ("Citizens Gas"), also filed a joint amici curiae brief in support of the Commission's order.

2. Ind.Code § 8-1-8.8-2 defines "clean coal and energy projects" as any of the following:

 (1) Any of the following projects:

(A) Projects at new energy production or generating facilities that employ the use of clean coal technology and that produce energy, including substitute natural gas, primarily from coal or gases, derived from coal from the geological formation known as the Illinois Basin.

(B) Projects to provide advanced technologies that reduce regulated air emissions from existing energy production or generating plants that are fueled primarily by coal or gases from coal from the geological formation known as the Illinois Basin, such as flue gas desulfurization and selective catalytic reduction equipment.

(C) Projects to provide electric transmission facilities to serve a new energy production or generating facility.

timely recovery of costs incurred during construction and operation" of the project. Ind.Code § 8–1–8.8–11(a)(1).

Pursuant to statute, the Indiana Office of Utility Consumer Counselor participated in the proceedings before the Commission. *See* Ind.Code § § 8–1–1.1. Additionally, the Indiana Industrial Group, Nucor Steel, the Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Valley Watch, Inc., the Sierra Club, the Indiana Wildlife Federation, the Clean Air Task Force, and the Indiana Coal Council intervened in the action.

Extensive amounts of evidence were presented to the Commission, and an evidentiary hearing was held in June 2007. After the evidentiary hearing, Vectren, which had sought approval for up to 20% ownership in the facility, withdrew its petition, and the proceedings continued as to Duke's petition with Duke to have 100% ownership of the proposed facility. A public hearing was held in Bloomington, Indiana, on August 29, 2007. On November 16, 2007, the Commission held an executive session to deliberate on Duke's petition. The Commission then issued a public notice that it would meet on November 20, 2007, to discuss or vote on Duke's petition.

On November 19, 2007, Appellants filed a motion to reopen the record, alleging that: (1) Duke had issued two requests for proposals for up to 1000 MW of new capacity, which would render the Edwardsport facility "unnecessary in the near term;" (2)

continuing increases in construction costs made Duke's cost information "stale, out-of-date, and unreliable;" (3) Vectren's withdrawal from the project made Duke's "baseline analysis . . . inaccurate and inappropriate;" (4) recent changes to congressional legislation and EPA regulations had "affected the risk profile of utilities with significant carbon emissions;" and (5) Duke had filed a petition to increase "demand-side management" investments. Appellants' Appendix at 143–144.

On November 20, 2007, the Commission issued a sixty-three page order granting Duke's petition for Certificates of Public Convenience and Necessity for the Edwardsport IGCC facility. The Commission also ordered that Duke was entitled to "timely recovery of its construction, operating and maintenance costs incurred in connection with the IGCC Project. . . ." *Id.* at 82. Additionally, the Commission denied Appellants' request to reopen the record. Specifically, the Commission found that it had reviewed the motion and found that it did not "satisfy the criteria set forth in 170 IAC 1–1.1–22" for reopening the proceedings. *Id.* at 24.

■■■ Appellants now challenge the Commission's grant of Duke's petition. This court's review of the Commission's decision is two-tiered. *See* Ind.Code § 8–1–3–1 (providing for judicial review of IURC decisions). "We first determine whether specific findings exist as to all factual determinations material to the ultimate conclusions, and we inquire if substantial evidence exists within the record as a whole to support the [Commission's]

---

(D) Projects that produce substitute natural gas from Indiana coal by construction and operation of a coal gasification facility.

(2) Projects to develop alternative energy sources, including renewable energy projects and coal gasification facilities.

(3) The purchase of fuels produced by a coal gasification facility.

(4) Projects described in subdivisions (1) through (3) that use coal bed methane.

basic findings of fact." *Ind. Office of Util. Consumer Counselor v. Lincoln Util., Inc.*, 784 N.E.2d 1072, 1074 (Ind.Ct.App.2003). In determining whether the evidence supports the Commission's decision, we neither reweigh the evidence nor substitute our judgment for that of the Commission. *Id.* We set aside the Commission's findings of fact only when a review of the entire record clearly indicates that its decision lacks a reasonably sound basis of evidentiary support. *Id.* Additionally, we determine whether the Commission's order is contrary to law, that is, whether the order is the result of considering or failing to consider some factor or element that improperly influenced the final decision. *Id.* at 1074–1075. A decision is contrary to law when the Commission fails to stay within its jurisdiction and abide by the statutory and legal principles that guide it. *Id.* at 1075.

## I.

The first issue is whether the Commission erred by denying Appellants' request to reopen the record. The Indiana Administrative Code provisions applicable to the Commission provide:

 (a) At any time after the record is closed, but before a final order is issued, any party to the proceeding may file with the commission and serve upon all parties of record a petition to reopen the proceeding for the purpose of taking additional evidence.

 (b) A petition to reopen the record shall set forth clearly the facts claimed to constitute grounds requiring reopening of the proceeding, including the following:

 (1) Material changes of fact or law alleged to have occurred since the conclusion of the hearing.

 (2) The reason or reasons such changes of fact or law could not have been reasonably foreseen by the moving party prior to the closing of the record.

 (3) A statement of how such changes of fact or law purportedly would affect the outcome of the proceeding if received into evidence.

 (4) A showing that such evidence will not be merely cumulative.

 (5) A petition to reopen the record shall be verified or supported by affidavit.

 (c) Within ten (10) days following the service of such petition to reopen upon all parties to the proceeding, any other party may file a response to the petition unless the presiding officer shall prescribe a different time. Any reply to such responses shall be filed within seven (7) days following service of the response unless the presiding officer shall prescribe a different time.

 (d) Before a final order is issued, and upon notice to the parties, the commission, on its own motion, may reopen the proceeding for the receipt of further evidence if justice so requires.

\* \* \* \* \*

170 IAC 1–1.1–22. Thus, a party is required to demonstrate that material changes of fact or law had occurred since the hearing, those changes of fact or law could not have been reasonably foreseen, the changes of fact or law would affect the outcome of the proceeding, and the evidence is not cumulative.

Appellants filed a motion to reopen the record, alleging that: (1) Duke had issued two requests for proposals for up to 1000 MW of new capacity, which would render the Edwardsport facility "unnecessary in

the near term;" (2) continuing increases in construction costs made Duke's cost information "stale, out-of-date, and unreliable;" (3) Vectren's withdrawal from the project made Duke's "baseline analysis . . . inaccurate and inappropriate;" (4) recent changes to congressional legislation and EPA regulations had "affected the risk profile of utilities with significant carbon emissions;"[3] and (5) Duke had filed a petition to increase "demand-side management" investments. Appellants' Appendix at 143–144. The Commission denied Appellants' motion to reopen the record, concluding that Appellants' motion did not satisfy the criteria of 170 IAC 1–1.1–22.

■ We first address Appellants' contention regarding Duke's requests for proposals. Duke points out that those requests concern "peaking and/or intermediate" capacity, not base load capacity that would be provided by the Edwardsport IGCC facility. Appellee Duke's Brief at 26 (citing Appellee's Appendix at 40–41). Moreover, the Commission was aware that purchased power had been relied upon by Duke and noted in its order that purchased power would "likely continue to be a part of the Company's most economical supply portfolio for several years." Appellants' Appendix at 36. Appellants have failed to demonstrate that this issue was a material change or that it would affect the outcome of the proceeding if received into evidence. *See* 170 IAC 1–1.1–22(b).

■ Second, Appellants contend that increased construction costs required the Commission to reopen the record. However, evidence was presented to the Commission during the evidentiary hearings that certain construction costs were esca-

lating, and the Commission mentioned those costs in its order. This issue was considered by the Commission, and Appellants have failed to demonstrate that this issue was a material change or that it would affect the outcome of the proceeding if received into evidence.

■ Next, Appellants argue that Vectren's withdrawal from the project is a change that required reopening the proceedings. However, Duke's petition requested approval for up to 100% ownership of the facility by Duke and up to 20% ownership of the facility by Vectren. The Commission considered Vectren's withdrawal and noted in its order that, because Duke's request included up to 100% ownership of the facility, "consideration of the issues in this matter [could] properly proceed without participation by Vectren." Appellants' Appendix at 22 n. 1. Additionally, the Commission noted in its order that Duke had analyzed a 100% ownership scenario. Again, this issue was considered by the Commission, and Appellants have failed to demonstrate that this issue was a material change or that it would affect the outcome of the proceeding if received into evidence.

■ Finally, Appellants argue that its petition should have been granted because Duke had filed a petition to increase demand-side management investments. According to Duke, "[d]emand-side management generally describes utility activities or programs designed to encourage customers to alter or reduce their consumption, particularly during periods of peak demand, e.g. hot summer days." Appellee Duke's Brief at 5 n. 2. Duke points out

---

**3.** On appeal, Appellants do not argue that the Commission should have reopened the proceedings on the basis of changes to carbon legislation and regulation. Thus, we do not address the issue.

that the Commission was informed during the presentation of evidence that Duke would be filing a proposal regarding demand-side management programs and that the Commission noted the program in its order. The Commission also concluded that Duke had appropriately considered "conservation and load management alternatives" to construction of the Edwardsport IGCC facility. Appellants' Appendix at 42. We conclude that issue was already considered by the Commission, and Appellants have failed to demonstrate that this issue was a material change that would have affected the outcome of the proceeding if received into evidence.

In summary, Appellants' contentions are not "material changes of fact or law" occurring after the conclusion of the hearing, and Appellants failed to demonstrate that the alleged "changes of fact or law" would have affected the outcome of the proceeding if received into evidence. Appellants have failed to demonstrate that the Commission erred by denying its request to reopen the proceedings under 170 IAC 1–1.1–22. *See, e.g., In re CTS Corp.*, 428 N.E.2d 794, 802 (Ind.Ct.App.1981) (holding that the commissioner did not abuse its discretion by denying a request to reopen the record where the proposed evidence was cumulative of evidence presented at the hearing).

## II.

The next issue is whether the applicable statutes allow Duke to recover costs while the facility is under construction. Appellants argue that the applicable statutes conflict as to whether Duke may recover costs during the construction of the facility. According to Appellants, construction costs should not be recovered because other statutes "require facilities to be used and useful before recovering through rates the costs of an entirely new and untested property that, in fact, may never go into service." Appellants' Brief at 26. Appellants contend that the recovery of construction costs "should not be allowed for an entirely new generating plant but [should] be limited to technological upgrades to existing facilities connected with rendering service." *Id.*

Ind.Code § 8–1–2–6 and Ind.Code §§ 8–1–8.8 are at issue here. When interpreting a statute, we independently review a statute's meaning and apply it to the facts of the case under review. *Bolin v. Wingert*, 764 N.E.2d 201, 204 (Ind.2002). "The first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question." *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 703–704 (Ind.2002). If a statute is unambiguous, we must give the statute its clear and plain meaning. *Bolin*, 764 N.E.2d at 204. A statute is unambiguous if it is not susceptible to more than one interpretation. *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind. 2001). However, if a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. *Bolin*, 764 N.E.2d at 204. We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *Id.*

If two statutes conflict, our first task in statutory interpretation is to attempt to harmonize the conflicting statutes. *State v. Universal Outdoor, Inc.*, 880 N.E.2d 1188, 1191 (Ind.2008). "So long as two statutes can be read in harmony with one another, we presume that the Legislature intended for them both to have effect." *Id.* While the "latter of two repugnant

statutes will control and operate to repeal the earlier to the extent of the repugnancy, such implied repeal should be recognized 'only when a later act is so repugnant to an earlier one as to render them irreconcilable, and a construction which will permit both laws to stand will be adopted if at all possible.'" *Id.* (quoting *Bd. of Trs. of Ind. Public Employees' Ret. Fund v. Grannan,* 578 N.E.2d 371, 375 (Ind.Ct.App.1991), *trans. denied* ). "Where possible, if conflicting portions of a statute can be reconciled with the remainder of the statute, every word in the statute must be given effect and meaning, with no part being held meaningless." *Id.* Additionally, "where provisions of a statute conflict, the specific provision takes priority over the general provision." *Robinson v. Wroblewski,* 704 N.E.2d 467, 475 (Ind.1998).

■ Ind.Code § 8–1–2–6 provides that the Commission "shall value all property of every public utility actually *used and useful* for the convenience of the public at its fair value ...." (emphasis added). We interpreted the "used and useful" phrase in *Indiana–American Water Co., Inc. v. Ind. Office of Util. Consumer Counselor,* 844 N.E.2d 106 (Ind.Ct.App.2006). We noted that Ind.Code § 8–1–2–6 is used in rate proceedings to "establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investments which will compensate its investors." *Indiana–American Water,* 844 N.E.2d at 110 (quoting *City of Evansville v. S. Ind. Gas & Elec. Co.,* 167 Ind.App. 472, 478, 339 N.E.2d 562, 568 (1975)). The Commission must determine the utility's rate base, which "is usually defined as that utility property 'used and useful' in rendering the particular utility service." *Id.* at 111. The "used and useful" standard requires: "(1) that the utility plant be actually devoted to providing utility service, and (2) that the plant's

utilization be reasonably necessary to the provision of utility service." *Id.; see, e.g., Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.,* 485 N.E.2d 610, 614 (Ind.1985) (holding that costs incurred in connection with a cancelled nuclear power plant could not be recovered because the facility was never "used and useful"). Appellants use this statute to argue that Duke was not entitled to the recovery of its construction costs for the Edwardsport IGCC facility because the facility was not yet "used and useful."

The other statutes at issue here are Ind.Code §§ 8–1–8.8, which encourage the use of clean coal technology in Indiana. As an incentive for the use of clean coal technology, Ind.Code § 8–1–8.8–11(a) provides: "The commission shall encourage clean coal and energy projects by creating the following financial incentives for clean coal and energy projects, if the projects are found to be reasonable and necessary: (1) The timely recovery of costs incurred *during construction* and operation of [certain clean coal and energy projects] ...." (emphasis added). Additionally, Ind.Code § 8–1–8.8–12 provides, in part:

(a) The commission shall provide financial incentives to eligible businesses for new energy producing and generating facilities in the form of *timely recovery of the costs incurred in connection with the construction,* repowering, expansion, operation, or maintenance of the facilities.

(b) An eligible business seeking authority to timely recover the costs described in subsection (a) must apply to the commission for approval of a rate adjustment mechanism in the manner determined by the commission.

(c) An application must include the following:

(1) A *schedule for the completion of construction,* repowering, or expansion of the new energy generating or coal gasification facility for which rate relief is sought.

(2) Copies of the most recent integrated resource plan filed with the commission, if applicable.

(3) The amount of capital investment by the eligible business in the new energy generating or coal gasification facility.

(4) Other information the commission considers necessary.

(emphasis added). The plain language of Ind.Code §§ 8–1–8.8 allows the recovery of costs during construction of a clean coal and energy project.

 Duke argues that the two statutes do not conflict. Duke contends that Ind. Code §§ 8–1–8.8 allows a utility to recover construction costs when building certain types of facilities and, after the facility is functioning, Ind.Code § 8–1–2–6 requires the utility to present evidence that the facility is used and useful before the facility's value is included in the rate base. We agree with Duke's interpretation, which harmonizes the two statutes.

 Moreover, to the extent that the statutes conflict, we note that Ind.Code § § 8–1–8.8 are the more specific statutes while Ind.Code § 8–1–2–6 is the more general one. As we previously noted, "where provisions of a statute conflict, the specific provision takes priority over the general provision." *Robinson,* 704 N.E.2d at 475. Ind.Code §§ 8–1–8.8 is an exception to the general "used and useful" requirement of Ind.Code § 8–1–2–6.

We conclude that the Commission's grant of "timely recovery of [Duke's] construction ... costs" is not clearly erroneous. *See, e.g., Worman Enter., Inc. v. Boone County Solid Waste Mgmt. Dist.,* 805 N.E.2d 369, 374 (Ind.2004) ("[E]ven if the District is viewed as the County and therefore a 'unit,' the specific grant of authority in the Solid Waste Management District Act governs over the general terms of the Home Rule Act.").

### III.

 The next issue is whether the Commission adequately considered all known costs and estimates of future costs of the Edwardsport IGCC facility. Appellants argue that the Commission failed to consider future carbon regulations, the "extreme uncertainty of those costs," and the "absence of a cost estimate for carbon capture and storage." Appellants' Brief at 27. According to Appellants, future carbon regulation will require additional investment in the Edwardsport IGCC facility and the carbon compliance costs should have been considered in determining whether IGCC was the preferred option.

Extensive evidence was presented to the Commission by Duke, Appellants, and other intervenors regarding possible future carbon regulations, carbon capture abilities of the proposed Edwardsport IGCC facility, possible future costs related to the carbon regulations, and options other than IGCC that were considered by Duke. Numerous findings and conclusions by the Commission address the carbon issues. *See* Appellants' Appendix at 46–50, 53, 59, 62–64, 67. In particular, the Commission noted:

> With respect to our consideration of issues regarding the forecast of $CO_2$ emission allowance prices we find that Duke Energy Indiana effectively utilized various scenarios that analyzed the impact of possible future carbon regulation. While there was almost uniform agreement in this proceeding that $CO_2$ emissions will be regulated in the future, these emissions are not regulated today.

Therefore, the Commission cannot assume or reasonably speculate in this proceeding regarding what, if any action, the U.S. Congress may ultimately take with respect to carbon regulation. Therefore, we find that [Duke's] analysis of potential future $CO_2$ emission allowance prices is reasonable as it strikes an appropriate balance with respect to alternative scenarios that may be applicable to the future regulation of carbon emissions.

*Id.* at 50. The Commission recognized that uncertainties exist regarding carbon capture and sequestration and ordered Duke to "continue its efforts to prepare for a future in which carbon is regulated." *Id.* at 67, 83.

Appellants do not challenge any particular finding or conclusion. Rather, Appellants focus on speculation concerning future carbon regulations and on a broad policy assessment that the Edwardsport IGCC facility should be delayed until future carbon regulations are known. Appellants' argument is merely a request that we substitute our judgment for that of the Commission.

The Commission recognized that Duke had considered several options in providing electricity in the future for its customers[4] and that Duke "reasonably concluded that the IGCC project will be a more reliable supply resource than wind for addressing baseload capacity need." *Id.* at 42. Such complex evidentiary issues and policy determinations are better decided by an agency with technical expertise than this court. *See PSI Energy, Inc. v. Ind. Office of Util. Consumer Counsel,* 764 N.E.2d 769, 773 (Ind.Ct.App.2002) ("Basic findings of fact are important because they enlighten the reviewing court as to the agency's 'reasoning process and subtle policy judgments' and allow for 'a rational and informed basis for review,' which lessens the likelihood that a reviewing court would substitute its 'judgment on complex evidentiary issues and policy determinations' better decided by an agency with technical expertise."), *reh'g denied, trans. denied.* The Commission's findings and conclusions on this issue are not clearly erroneous.

### IV.

■ The final issue is whether Ind. Code §§ 8–1–8.5, Ind.Code §§ 8–1–8.7, and Ind.Code §§ 8–1–8.8 violate the dormant Commerce Clause because the statutes express a preference for Indiana coal.[5] The Commerce Clause of the Unit-

---

4. The Commission noted:

 [T]he evidence presented in this matter also indicates that Duke Energy Indiana adequately considered cogeneration and renewable energy sources in its resource planning process. Duke Energy Indiana demonstrated that, for both technical and economic reasons, cogeneration and renewable energy sources cannot be used as substitutes for the capacity of the IGCC Project. Duke Energy Indiana adequately considered wind and other renewables, and demonstrated that such resources, though promising, cannot be counted on to fulfill Duke Energy's substantial capacity need, specifically its need for baseload generation. Duke Energy Indiana reasonably concluded that the IGCC project will be a more reliable supply resource than wind for addressing baseload capacity needs. We find that Duke Energy Indiana has adequately considered cogeneration and renewable energy alternatives and that its decision to acquire needed capacity by means other than cogeneration and renewable energy sources is reasonable.

 Appellants' Appendix at 42.

5. In their Appellants' brief, Appellants also argued that tax incentives found in Ind.Code §§ 6–3.1–29 violated the Commerce Clause. However, in their reply brief, Appellants "concede that [Ind.Code §§ 6–3.1–29] appears to be allowed under 42 U.S.C. § 1649[1](c)," and they no longer challenge the statutes as a violation of the Commerce Clause. Appellants' Reply Brief at 9 n. 1.

ed States Constitution provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." This language, though expressed as a grant of power to Congress, "also directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1994). This "negative" or "dormant" feature of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988)); *see also Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 287–288, 117 S.Ct. 811, 818–819, 136 L.Ed.2d 761 (1997).

In response, Duke argues that Appellants waived this issue by failing to raise the constitutional issue before the Commission, that Appellants lack standing to raise the constitutional issue, that any constitutional problem is harmless error, that the statutes at issue do not violate the Commerce Clause, and that, even if the statutes violate the Commerce Clause, the offending portions are severable. Appellees, the Clean Air Task Force and the Indiana Wildlife Federation, agree with Duke and also argue that, even if the statutory provisions violate the Commerce Clause, the provisions at issue are severable and the Commission already did so in its order.[6] Because we conclude that it is unnecessary to address Appellants' dormant Commerce Clause arguments under the doctrine of judicial restraint, we also do not address appellees' waiver and standing arguments.

We begin our analysis with some background information. Appellants argue that Ind.Code §§ 8–1–8.5, Ind.Code §§ 8–1–8.7, and Ind.Code §§ 8–1–8.8 violate the dormant Commerce Clause by expressing a preference for Indiana coal. Ind.Code §§ 8–1–8.5 concern the issuance of a Certificate of Public Convenience and Necessity for the construction of a utility power plant and the factors that the Commission must consider, including whether "the facility, if it is a coal-consuming facility, utilizes Indiana coal or is justified, because of economic considerations or governmental requirements, in using non-Indiana coal." Ind.Code § 8–1–8.5–5(b)(4). Ind.Code §§ 8–1–8.7 concern the issuance of a Certificate of Public Convenience and Necessity for the use of "clean coal technology" and the factors that the Commission must consider, including whether "the facility where the clean coal technology is employed: (A) utilizes and will continue to utilize Indiana coal as its primary fuel source; or (B) is justified, because of economic considerations or governmental requirements, in utilizing non-Indiana coal; after the technology is in place." Ind. Code § 8–1–8.7–4(b)(3). Ind.Code §§ 8–1–8.8 provide certain financial incentives for "clean coal and energy projects," which include projects primarily utilizing coal from the Illinois Basin. *See* Ind.Code § 8–1–8.8–2, –11, –12.

In *Gen. Motors Corp. v. Indianapolis Power & Light Co.,* 654 N.E.2d 752, 763–767 (Ind.Ct.App.1995), we addressed the same argument with respect to Ind.Code § 8–1–2–6.6 and Ind.Code §§ 8–1–27. Ind.Code § 8–1–2–6.6 allowed "the Commission to add the value of any 'qualified

**6.** The State, as amicus curiae, argues that Appellants' arguments are not justiciable, that the statutes do not violate the Commerce Clause, and that any offending provisions are severable. IPL, Vectren, and Citizens Gas argue that Appellants do not have standing because they are not injured by the statutory provisions at issue and because their hypothetical injury would not be within the zone of interests protected by the Commerce Clause.

pollution control property' (i.e., any air pollution control device, such as a scrubber, on a coal burning electric generating facility) to the value of the utility's property for ratemaking purposes, but only if the facility use[d] Indiana coal as a primary fuel source or if the utility [could] prove that it is justified by economic considerations or government requirements in using some non-Indiana coal." *Id.* at 766. Ind.Code § 8-1-27-6(b)(6)(A) provided "that if the utility proposes a change in fuel type which would result in diminished use of Indiana coal, the utility must submit an analysis of the economic and employment effects of the change on coal mining regions in Indiana and on the preservation of the mining of Indiana coal as a viable source of fuel." 654 N.E.2d at 764. Ind. Code § 8-1-27-8(1)(D) provided "that before the Commission can approve the plan, it must find that the plan either provides for continued or increased use of Indiana coal or that the plan is justified by economic considerations, including the effects on Indiana coal mining regions." *Id.* Ind. Code § 8-1-27-20 provided "for annual reviews of compliance plans which result in the diminished use of Indiana coal." *Id.*

Holding that the statutes violated the Commerce Clause, we relied upon Judge Tinder's decision in *Alliance for Clean Coal v. Bayh*, 888 F.Supp. 924 (S.D.Ind. 1995), which was later affirmed by the Seventh Circuit Court of Appeals in *Alliance for Clean Coal v. Bayh*, 72 F.3d 556 (7th Cir.1995). 654 N.E.2d at 763–767. In the *Alliance for Clean Coal* decisions, the courts held that the provisions of Ind.Code §§ 8-1-27 were "plainly protectionist," discriminated against interstate commerce, and violated the Commerce Clause. 72 F.3d at 558, 560. We held in *General Motors* that, under the same principles discussed by Judge Tinder in *Alliance for Clean Coal*, Ind.Code § 8-1-2-6.6 and Ind. Code §§ 8-1-27 were unconstitutional interferences with interstate commerce under the Commerce Clause. 654 N.E.2d at 766. However, we found that the unconstitutional provisions of the statutes could be severed, and we remanded for reconsideration by the Commission. *Id.* at 767. In doing so, we noted that if the "IPL plan is found by the Commission to be the option best fitting the non-protectionist criteria in the statute, no bar exists to its approval on the basis that it includes the use of Indiana coal and scrubbers." *Id.*

■ Although Appellants urge us to find Ind.Code §§ 8-1-8.5, Ind.Code §§ 8-1-8.7, and Ind.Code §§ 8-1-8.8 unconstitutional based upon *General Motors*, we note that the Indiana Supreme Court has emphasized that courts should use restraint in deciding the constitutionality of statutes. *Ind. Wholesale Wine & Liquor Co., Inc. v. State ex rel. Ind. Alcoholic Beverage Comm'n*, 695 N.E.2d 99, 106 (Ind.1998) (discussing the doctrine of judicial restraint). "While a reviewing court can freely choose any apparent statutory or common law basis upon which a judgment can be sustained, constitutional issues are to be avoided as long as there are potentially dispositive statutory or common law issues still alive." *Id.* at 107 (citing *Bayh v. Sonnenburg*, 573 N.E.2d 398, 402 (Ind.1991), *reh'g denied, cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992)). "Constitutional questions will not be decided unless absolutely necessary to a determination of the merits of the case." *Saloom v. Holder*, 158 Ind. App. 177, 184, 304 N.E.2d 217, 222 (1973), *reh'g denied.* "This doctrine of judicial restraint has been repeatedly applied by the courts to cases in which the rights of the complaining party would be the same whether or not the challenged enactment is held unconstitutional on appeal." *Id.* at 184–185, 304 N.E.2d at 222.

■ Here, even if we held that the statutes at issue violated the Commerce Clause, Appellants would not be entitled to relief. If we found the statutory provisions to be unconstitutional, as in *General Motors* and *Alliance for Clean Coal,* we would sever the provisions.[7] In their Appellants' brief, Appellants make a cursory argument that the allegedly offensive provisions are not severable. Appellants' Brief at 23. In their reply brief, Appellants expand their argument slightly by arguing that "the unconstitutional 'Indiana coal' preference is so pervasive with respect to the choice of technology, approvals of construction, and the subsequent rate treatment for the Edwardsport IGCC project that it should be struck down...." Reply Brief at 10. The provisions at issue in Ind.Code §§ 8-1-8.5 and Ind.Code §§ 8-1-8.7 are merely factors for the Commission to consider in determining whether to issue Certificates of Public Convenience and Necessity and are easily severable. The provisions at issue in Ind. Code §§ 8-1-8.8 relate to the use of Illinois Basin coal. Even if "Illinois Basin" coal could be considered to be solely Indiana coal, those provisions are also easily severable.[8]

Remand to the Commission for reconsideration of the petition without reference to the severed factors would be unnecessary because, in recognition of *General Motors,* the Commission held as follows:

We recognize that in *General Motors Corp. v. Indianapolis Power & Light Co.,* 654 N.E.2d 752 (Ind.Ct.App.1995), the Court of Appeals ("Court") declared that a portion of IC 8-1-2-6.6 relating to Indiana coal violates the Commerce Clause of the United States Constitution. The Court severed the unconstitutional provision from the remainder of the statute which was held to be valid and effective. The Court stated that if a plan "is found by the Commission to be the option best fitting the non-protectionist criteria in the statute, no bar exists to its approval on the basis that it includes the use of Indiana coal...." Although we find that the proposed IGCC Project will allow [Duke] to continue the use of Indiana and Illinois Basin coal, in accordance with the *General Motors* case, we do not treat this factor as a prerequisite for Duke Energy Indiana's requested relief in this case.

Appellants' Appendix at 28 n. 5. Thus, the Commission has already severed the statu-

7. Ind.Code § 1-1-1-8 governs the severability of statutory provisions and provides:
 (a) If any provision of this Code as now or later amended or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions that can be given effect without the invalid provision or application.
 (b) Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable. If any provision or application of a statute is held invalid, the invalidity does not affect the remainder of the statute unless:
 (1) the remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remain-

der would have been enacted without the invalid provision or application; or
 (2) the remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application.
This subsection applies to every statute, regardless of whether enacted before or after the passage of this subsection. The general assembly may preserve the legislative history of this subsection by adoption of a concurrent resolution and publication of the resolution in the legislative journals.

8. We express no opinion regarding whether Illinois Basin coal is, as Appellants suggest, a "veiled reference to Indiana coal." Appellants' Brief at 22.

tory provisions at issue here, and the Commission did not consider the use of Indiana coal as a factor in granting Duke's petition.[9]

Even if we concluded that the statutory provisions at issue violated the Commerce Clause and had to be severed, Appellants would be entitled to no relief. As a result, we conclude that it is unnecessary for us to decide Appellants' constitutional challenge to Ind.Code §§ 8–1–8.5, Ind.Code §§ 8–1–8.7, and Ind.Code §§ 8–1–8.8. *See, e.g., Saloom,* 158 Ind.App. at 184–185, 304 N.E.2d at 222 (refusing to address the appellants' constitutional claim because resolution of the constitutional claim could have no effect upon her right to recover from the defendants).

For the foregoing reasons, we affirm the Commission's grant of Duke's petition.

Affirmed.

BAKER, C.J. and MATHIAS, J. concur.

9. Appellants point out that, much later in the Commission's order, the Commission made findings on "Ratemaking and Accounting Requests" and stated:

> The Commission is mindful that the IGCC Project is the first proposal to build a baseload generating plant in the State of Indiana since the 1980s, and that with such an undertaking come significant financing and capital costs. We are cognizant of the Indiana General Assembly's encouragement of new generating facilities that *utilize Indiana coal* and clean coal technology, such as coal gasification under IC 8–1–8.8, and that the Governor's Home Grown Energy Plan also encourages generation additions to meet Indiana's growing electricity needs. Therefore, we have approved specific statutory incentives in this Cause as set forth in this Order. We further find that Petitioner's proposed IGCC Rider is approved for use and for the recovery of the approved IGCC Project costs, including fi-

nancing, O & M, depreciation, property taxes, payroll costs, and property insurance costs as proposed by Petitioner. Additionally, we approve Petitioner's request for deferral of post-in-service carrying costs and O & M costs on an interim basis until such costs are reflected in Duke Energy Indiana's retail rates.

Appellants' Appendix at 77 (emphasis added). Appellants argue this paragraph demonstrates that the Commission expressly approved the incentives allowed in Ind.Code §§ 8–1–8.8 as a result of Duke's use of Indiana coal. We conclude that Appellants' emphasis on this one reference to Indiana coal is misplaced. First, the Commission merely noted that it was *aware* of the General Assembly's encouragement, not that it approved the incentives because of the use of Indiana coal. *Id.* Moreover, the Commission specifically noted that it did not consider the use of Indiana coal as "a prerequisite for Duke Energy Indiana's requested relief in this case." *Id.* at 28 n. 5.