# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**J. DAVID AGNEW**
Lorch Naville Ward, LLC
New Albany, Indiana

**JENNIFER A. WASHBURN**
Citizens Action Coalition of Indiana, INC.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**JON LARAMORE**
**JANE DALL WILSON**
Faegre Baker Daniels LLP
Indianapolis, Indiana

**KELLEY A. KARN**
**ELIZABETH A. HERRIMAN**
Duke Energy Business Services LLC
Plainfield, Indiana

**FILED**
Aug 21 2014, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

CITIZENS ACTION COALITION OF )
INDIANA, INC., SAVE THE VALLEY, INC., )
SIERRA CLUB, AND VALLEY WATCH, INC., )
    Appellants, )
                          )
          vs. )  No. 93A02-1310-EX-835
                          )
DUKE ENERGY INDIANA, INC., )
INDIANA OFFICE OF UTILITY CONSUMER )
COUNSELOR, INDIANA UTILITY )
REGULATORY COMMISSION, )
    Appellees. )

APPEAL FROM THE INDIANA UTILITY REGULATORY COMMISSION
James D. Atterholt, Chairman
Kari A.E. Bennett, Commissioner
Larry S. Landis, Commissioner
Carolene Mays, Commissioner
David E. Ziegner, Commissioner
Cause No. 43114-IGCC-10

**August 21, 2014**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Sierra Club, Inc., and Valley Watch, Inc. (collectively, "Interveners") appeal an order of the Indiana Utility Regulatory Commission ("the Commission") approving a request from Duke Energy, Indiana, Inc. ("Duke") to include power plant construction costs incurred April 1, 2012 to September 30, 2012 in a rate adjustment rider ("ICGG-10"), in implementation of a settlement agreement between Duke, the Indiana Office of Utility Consumer Counselor ("the OUCC"), and other entities. We affirm.

**Issues**

Interveners present two issues for review: whether the ratemaking order is contrary to law because:

I.   The Commission applied an incorrect statutory standard that placed an undue burden upon Interveners when the Commission approved the total of requested construction-related financing costs despite a two and one-half month delay in construction; or

II.  The Commission disregarded relevant case law by approving capitalized financing costs that permitted a return on capital contributed from ratepayers attributable to deferred taxes.

**Facts and Procedural History**

On November 20, 2007, the Commission issued Certificates of Public Convenience and Necessity ("CPCN"), approving the cost estimate of $1.985 billion to build an integrated coal gasification combined cycle generating facility in Edwardsport, Indiana ("the IGCC Project"). The construction and operating costs were recoverable from ratepayers. The relevant facts regarding the issuance of the CPCNs were summarized in Citizens Action

2

Coalition v. PSI Energy, 894 N.E.2d 1055, 1059-60 (Ind. Ct. App. 2008), reh'g denied

("Duke I"):

On September 7, 2006, Duke and Southern Indiana Gas and Electric Company, d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren") filed a petition with the Commission seeking approval to build an integrated gasification combined cycle ("IGCC") electric power plant at Duke's Edwardsport facility in Knox County, Indiana. Duke operated a coal and oil-fired generating station at the Edwardsport facility that had a total of 160 megawatt capacity, was placed in service between 1944 and 1951, and was nearing the end of its useful economic life. The proposed IGCC facility would have a 630 megawatt capacity. An IGCC generating facility converts coal into synthesis gas, which is used to fuel highly efficient combustion turbines. The IGCC technology is a cleaner and more efficient way of producing electricity than conventional coal-fired plants.

Before constructing an electric generating facility in Indiana, public utilities must obtain a Certificate of Public Convenience and Necessity under Ind. Code §§ 8-1-8.5. Additionally, under Ind. Code §§ 8-1-8.7, a public utility may not use clean coal technology, such as IGCC, at a new or existing facility without obtaining a Certificate of Public Convenience and Necessity.

Duke's petition also sought, in part, to obtain certain financial incentives authorized under Ind. Code §§ 8-8-8.8 for a clean coal and energy project,[1]

---

[1] Ind. Code § 8-1-8.8-2 defines "clean coal and energy projects" as any of the following:

  (1) Any of the following projects:

    (A) Projects at new energy production or generating facilities that employ the use of clean coal technology and that produce energy, including substitute natural gas, primarily from coal or gases, derived from coal from the geological formation known as the Illinois Basin.

    (B) Projects to provide advanced technologies that reduce regulated air emissions from existing energy production or generating plants that are fueled primarily by coal or gases from coal from the geological formation known as the Illinois Basin, such as flue gas desulfurization and selective catalytic reduction equipment.

    (C) Projects to provide electric transmission facilities to serve a new energy production or generating facility.

    (D) Projects that produce substitute natural gas from Indiana coal by construction and operation of a coal gasification facility.

such as "[t]he timely recovery of costs incurred during construction and operation" of the project. Ind. Code § 8-1-8.8-11(a)(1).

Pursuant to statute, the Indiana Office of Utility Consumer Counselor participated in the proceedings before the Commission. See Ind. Code §§ 8-1-1.1. Additionally, the Indiana Industrial Group, Nucor Steel, the Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Valley Watch, Inc., the Sierra Club, the Indiana Wildlife Federation, the Clean Air Task Force, and the Indiana Coal Council intervened in the action.

Extensive amounts of evidence were presented to the Commission, and an evidentiary hearing was held in June 2007. . . . On November 20, 2007, the Commission issued a sixty-three page order granting Duke's petition for Certificates of Public Convenience and Necessity for the Edwardsport IGCC facility. The Commission also ordered that Duke was entitled to "timely recovery of its construction, operating and maintenance costs incurred in connection with the IGCC Project…" [Appellant's Appendix] at 82.

This Court affirmed the Commission's CPCN Order approving the cost estimate of $1.985 billion. Id. at 1070.

On June 3, 2008, the Commission issued an order providing that its review of the IGCC Project would be conducted first by the introduction and consideration of evidence presented in semi-annual IGCC Rider proceedings[2] and second, through independent engineering oversight of the IGCC Project. On January 7, 2009, the Commission issued an order in IURC Cause No. 43114IGCC-1 ("IGCC-1") approving an increase in the cost

---

(2) Projects to develop alternative energy sources, including renewable energy projects and coal gasification facilities.

(3) The purchase of fuels produced by a coal gasification facility.

(4) Projects described in subdivisions (1) through (3) that use coal bed methane.

[2] Indiana Code section 8-1-8.8-11 allows timely recovery of costs, for which "rider" proceedings are used. After approval of the revenue amount, it is recoverable from ratepayers in a rate "rider."

estimate from $1.985 billion to $2.35 billion.[3]  On November 3, 2008, Duke filed a semi-annual IGCC Rider proceeding for cost recovery, IURC Cause No. 43114IGCC-2 ("IGCC-2").  On May 13, 2009, the Commission approved the petition.  On May 1, 2009, Duke filed its petition in IURC Cause No. 43114IGCC-3 ("IGCC-3"); this was approved on December 2, 2009.  On November 24, 2009, Duke filed a petition that included its semi-annual IGCC rider proceeding for cost recovery, IURC Cause No. 43114IGCC-4 ("IGCC-4"), and, in a sub-docket proceeding, a request to review a revised cost estimate for the IGCC Project, IURC Cause No. 43114IGCC-4S1 ("IGCC-4S1").

On September 17, 2010, several intervening parties (not including the present Interveners)[4] submitted a settlement agreement to the Commission in IGCC-4S1.  The settlement agreement set a hard cap of $2.975 billion on the construction costs of the IGCC Project.  Subsequently, amidst an ethics scandal, the settlement agreement was withdrawn.  The Commission conducted extensive evidentiary hearings; the settling parties filed a petition to reopen the record and submit a second settlement agreement; additional testimony was presented at a four-day settlement hearing.  On December 27, 2012, the Commission

---

[3] This order was not appealed.  The $2.35 billion cost estimate included $2.225 billion in estimated construction costs and $125 million in estimated Allowance for Funds Used During Construction ("AFUDC"). AFUDC are financing costs that the utility accrues during construction or until the construction and financing costs are included in rates either through the IGCC rider or through a rate case.

[4] These included Duke, the Duke Energy Indiana Industrial Group (comprised of multiple Duke, Indiana consumers), and the OUCC (a state agency charged with representing the interests of ratepayers, consumers, and the public in actions before the Commission, the Department of State Revenue, the Indiana Department of Transportation, courts, and federal agencies pursuant to Indiana Code chapter 8-1-1.1).

The settling parties later expanded to include Nucor Steel.

5

approved the settlement with some modification (hereinafter, "the Modified Settlement Agreement").

The Modified Settlement Agreement set a $2.595 billion hard cap for construction costs to be included in rates over a thirty-year period. The total was inclusive of $2.319 billion of direct costs and approximately $276 million of AFUDC prior to June 30, 2012. After June 30, 2012, AFUDC would grow until construction while in progress financing charges ("CWIP") were put into effect.

With Duke having continued to make semi-annual IGCC Rider filings pending the settlement, the Commission determined that IURC Cause No. 43114IGCC-5 ("IGCC-5") and IURC Cause No. 43114IGCC-6 ("IGCC-6") would be considered as part of the Commission's review under the sub-docket proceedings in IGCC-4S1. Duke subsequently filed semi-annual IGCC Rider filings in IURC Cause Nos. 43114IGCC-7 ("IGCC-7") and 43114IGCC-8 ("IGCC-8"). On the same day it issued its Final Order in the IGCC-4S1 sub-docket, the Commission issued orders in IGCC-5, IGCC-6, IGCC-7, and IGCC-8, implementing the Modified Settlement Agreement approved in the Final Order in IGCC-4S1.[5]

The Edwardsport plant began commercial operations in 2013. Ultimately, the approved cost was $2.88 billion.

---

[5] The modifications consisted of "removing the deferred tax incentive going back to IGCC-4 and requiring the Company to refund to customers any surplus should Duke Energy Indiana recover more dollars in vendor litigation than shareholders have absorbed under the settlement." (App. 6.)

6

The Interveners filed Notices of Appeal to challenge orders in IGCC-4, IGCC-4S1, IGCC-5, IGCC-6, IGCC-7, and IGCC-8. Duke's petition to consolidate the appeals was granted. The orders on appeal consisted of one Commission order approving the Modified Settlement Agreement, and four orders implementing it. A panel of this Court affirmed the orders. Citizens Action Coal. of Ind., Inc. et al. v. Duke Energy Ind., Inc., et al., No. 93A02-1301-EX-76 (Mar. 19, 2014) ("Duke II").

On November 20, 2012, Duke filed a petition requesting that the Commission approve its construction progress report for the IGCC Project for April 1, 2012 through September 30, 2012 (the IGCC-10 period). Duke also requested approval of construction costs to be reflected in a rate rider.

The Commission conducted a hearing on June 4, 2013, at which Interveners contended that the costs of a construction delay of 80 days should be chargeable to Duke and not ratepayers. The OUCC also appeared and participated. On September 11, 2013, the Commission issued an order approving Duke's construction progress report and approving the requested dollar amount for inclusion in a rate rider. This appeal ensued.[6]

## Discussion and Decision

### Standard of Review

The Commission was created by the Indiana General Assembly to act "primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." Northern Ind. Public Serv. Co. v. U.S. Steel, 907 N.E.2d 1012, 1015 (Ind.

---

[6] A separate appeal was filed to challenge the order in IGCC-9.

2009). The Commission was assigned the responsibility "to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." Id. The five members, at least one of whom shall be an attorney, and not more than three of whom belong to the same political party, "shall be appointed by the governor from among persons nominated by the nominating committee in accordance with the provisions of IC 8-1-1.5." I.C. § 8-1-1-2(b).

Indiana Code section 8-1-3-1 provides for judicial review of the Commission's decisions in language almost identical to provisions for judicial review of other administrative agency actions:

> Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Our review is two-tiered:

> On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co., 485 N.E.2d 610, 612 (Ind. 1985). Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. McClain v. Review Bd. of Ind. Dept. of Workforce Dev., 693 N.E.2d 1314, 1317-18 (Ind. 1998)]. In substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most

favorable to the Board's findings." Id. The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. Id. at 1317 n. 2. This list of exceptions is not exclusive. Id.

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. Citizens Action Coalition, 485 N.E.2d at 612. McClain described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. McClain, 693 N.E.2d at 1317-18. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. Id. At 1318. If the subject is outside the Commission's expertise, courts give it less deference. Id. In either case courts may examine the logic of inferences drawn and any rule of law that may drive the result. Id. Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standard and legal principles involved in producing its decision, ruling, or order. Citizens Action Coalition, 485 N.E.2d at 612-13.

Northern Ind. Public Serv., 907 N.E.2d at 1016.

### Statutory Burden of Proof

Interveners' witness David Schlissel ("Schlissel"), President of Schlissel Technical Consulting, Inc., testified that, in his opinion, a delay of 80 days attributable to technical problems associated with human error and equipment failures, was unreasonable. He believed that an occurrence referred to as a "water hammer event" of June 26, 2012 was the primary cause of the delay,[7] as it "stalled progress" for 35 days and had "downstream

---

[7] After a temporary shut-down on June 25, 2012, a bypass valve was reopened to send steam from the heat

9

implications." (App. 26, 99.) Schlissel took the position that the delays were "uniquely within the control of [Duke] or its contractors." (App. 95.) He concluded his testimony by recommending that the Commission disallow for ratemaking purposes the costs associated with the 80 days of delay (estimated at around $53 million for CWIP and $24 million for AFUDC). Finding that Duke's actions during the review period did not "rise to the level of imprudence," the Commission did not follow the recommendation for a reduction. (App. 34.)

On appeal, Interveners assert that the Commission improperly burdened the Interveners to show that delays were imprudent, as opposed to requiring Duke to show, through "substantial documentation," that delay-related financing costs were "reasonable and necessary" as required by Indiana Code section 8-1-8.8-12. According to Interveners, "imprudence," the standard embodied in Indiana Code section 8-1-8.5-6.5,[8] would be applicable to a progress report review but not applicable to approval of financial incentives.

recovery steam generator to the condenser. When the valve was reopened, high energy steam reentered the cold reheat piping causing water in the pipe to be pushed forward rapidly and then stopped suddenly when it collided with a closed valve near the steam turbine. Pipe supports, hangers, and valves were damaged and required repair or replacement, causing a five or six week delay. In turn, this stalled other progress. According to witness David Schlissel, the root cause was "a drain valve that should have been opened [but] wasn't." (App. 101.)

[8] The statute provides in pertinent part:

Absent fraud, concealment, or gross mismanagement, a utility shall recover through rates the actual costs the utility has incurred in reliance on a certificate issued under this chapter, and as modified under sections 5.5 and 6 of this chapter as follows:

(1) If a facility has been found to be completed and the facility's construction has been subject to ongoing review under section 6(a) of this chapter, the costs of construction approved by the commission during the ongoing review shall be included in the utility's rate base without further commission review.

Indiana Code section 8-1-8.8-12 addresses financial incentives; recovery of costs; application for approval of rate adjustment mechanism; documentation; and actual or forecasted data. Subsection (a) states that the Commission shall provide incentives to eligible businesses for certain energy production or generating facilities in the form of timely recovery of specified costs. Subsection (b) provides that an eligible business seeking authority to timely recover the described costs must apply to the Commission for approval of a rate adjustment mechanism, and subsection (c) specifies the components an application must include. Subsection (d) provides that the Commission shall allow recovery of costs and expenses "if the eligible business provides substantial documentation that the expected costs and expenses and the schedule for incurring those costs and expenses are reasonable and necessary." (emphasis added.) Subsection (e) provides for the recovery of fuel purchasing costs, again "if the eligible business provides substantial documentation that the costs associated with the purchase are reasonable and necessary." (emphasis added.) Finally, subsection (f) dictates that a retail rate adjustment mechanism proposed by an eligible business may be based on actual or forecasted data. (emphasis added.)

Interveners assert that the requirement of "substantial documentation" persists at each rider proceeding and that the Commission failed to impose upon Duke this requirement – instead, examining the claimed costs for "imprudence." Duke contends that the statutory

---

(2) If a facility has been found to be completed and the facility's construction is subject to subsequent review under section 6(d) of this chapter, the costs of construction that do not exceed the estimate found under section 5(b)(1) of this chapter shall be included in the utility's rate base, except for costs that are shown to result from inadequate quality controls. However, inclusion of costs in excess of the estimate found by the commission under section 5(b)(1) of this chapter in the utility's rate base is not permitted unless shown by the utility in construction of that facility to be necessary and prudent.

requirement of substantial documentation is applicable in the context of requirements for an initial project approval and does not govern the semi-annual proceedings.

The interpretation of a statute is a question of law which we review de novo. Nash v. State, 881 N.E.2d 1060, 1063 (Ind. Ct. App. 2008), trans. denied. The best evidence of legislative intent is the language of the statute, giving all words their plain and ordinary meaning unless otherwise indicated by the statute. Chambliss v. State, 746 N.E.2d 73, 77 (Ind. 2001). We presume the legislature intended language to be applied logically. Nash, 881 N.E.2d at 1063.

As for Section 12, its various subsections reference the application process and its requirements. In one instance, in subsection (d), there is a reference to "expected" costs. A "schedule for completion of construction" is required by subsection (c). Our examination of the plain language leads us to agree with Duke that 8-1-8.8-12 concerns the initial application for financial incentives. We are not persuaded that, once a utility has demonstrated its eligibility for clean energy financial incentives,[9] the Commission is obliged to go beyond a reasonableness or prudence review to conduct a line item review to ascertain "substantial documentation."

In supplement, Interveners claim in their reply brief that the Commission "looked at the wrong documentation" (the ongoing progress report required for review of the capital costs) as opposed to substantial evidence in the record (required for financing costs) to assess whether the challenged costs were "reasonable" or "unreasonable" and "necessary" or

---

[9] The approval in this case took place in 2007. Citizens Action Coal., 894 N.E.2d at 1055.

"unnecessary." Reply Brief at 10. Interveners then assert the Commission should have found, "based on the 'correct' documentation from [Duke]," that the delay was within the "exclusive control of Duke and its contractors" and was thus neither reasonable nor necessary. Reply Brief at 10.

Distilled to its essence, Interveners' contention is that the Commission should have followed the recommendation of Interveners' expert to charge at least part of the costs of delay to Duke and not ratepayers. According to Interveners, the delay is untenable because the instrumentalities were within the control of Duke and the timeline simply reached too far beyond the prior estimates of completion and placement in-service. Interveners insist that this Court need not afford the Commission a high level of deference as to this matter. In other words, Interveners ask that we reweigh the evidence, find credible the testimony that Duke simply should not have let the delay happen, and order a reduction in the amount of construction costs allowed. This we cannot do. McClain, 693 N.E.2d at 1317. The allowance of costs is inherent in the ratemaking process and we accord deference to the Commission. The Commission did not act contrary to law when it found the "technical problems associated with human errors, equipment failures, or a combination of the two … within the control of the Company or its contractors" did not preclude Duke's recovery of its costs. (App. 94-95.)

<u>AFUDC</u>

Next, Interveners assert that the Commission allowed an AFUDC "rate of return that did not take into account the benefit Duke receives from money collected from customers for

deferred taxes," Appellants' Brief at 1, in contravention of <u>Evansville v. Southern Indiana Gas & Electric Co.</u>, 339 N.E.2d 562 (Ind. Ct. App. 1975).

At the hearing, Interveners presented the testimony of Ralph Smith ("Smith"), a regulatory consultant. In Smith's opinion, the CWIP proposed rate of return of 6.78% and the AFUDC proposed rates of return of 7.26% and 7.38% (depending upon the months represented) should be consistent. He challenged the calculation of AFUDC, claiming that deferred taxes was a necessary component of the calculation so as to avoid allowing a return on investment from ratepayer funds, as opposed to only the capital investors' contributions. In other words, Interveners asserted that the Commission ignored an interest-free loan extended to Duke because it could charge customers for tax liabilities but defer payment to taxing authorities, using the ratepayer funds in the interim. Smith opined that a proper reduction in AFUDC would be $264,000.

Duke witness Diana Douglas testified that Duke's calculation of AFUDC did not include accumulated deferred income taxes or unamortized investment tax credits and other cost elements used for regulatory cost of capital calculations in Indiana, because these are not specified for inclusion in guidelines promulgated by the Federal Energy Regulatory Commission ("FERC"). She observed that Duke had "computed its rate of return in accordance with prior Commission orders in all prior IGCC proceedings." (App 122.) She quoted a prior Commission order, in IGCC-9, acknowledging Duke's argument that deferred taxes are not generated during the construction phase.

The Commission rejected the Interveners' request "that Indiana's traditional AFUDC methodology should not be used for this project." (App. 34.) In so doing, the Commission observed that AFUDC had been calculated in conformance with FERC guidelines, adopted by the Commission "for use by Indiana electric utilities." (App. 35.)

On appeal, Interveners do not suggest that FERC guidelines mandate inclusion of deferred taxes as a component of AFUDC. Rather, they argue that exclusion is not required by FERC guidelines and note that at least one other state, Florida, provides for its inclusion.[10] Interveners claim that "Duke has proposed an inconsistent, piecemeal approach to calculating capitalized (AFUDC) financing costs, as compared to financing costs recovered immediately from ratepayers (CWIP financing costs)." Appellants' Brief at 21. Interveners also observe, in reliance upon City of Evansville, that Indiana's common law prohibits a return on investment from ratepayer funds; only the capital investor's contribution provides the base for a return on investment.

In City of Evansville, the petitioning utility ("Petitioner") had adopted a practice of depreciating its plant at an accelerated rate for purposes of federal income taxes[11] and also used an investment tax credit which directly reduced its tax liability for the year of plant acquisition. 339 N.E.2d at 584. For purposes of regulatory accounting, the Commission had allowed the Petitioner to claim as a current expense "not only the federal taxes actually paid, but also an amount equal to the difference between the taxes actually paid and the taxes

---

[10] Diana Douglas testified that Florida had adopted a modified AFUDC calculation.

[11] The Court observed that "taxes are a component of the utility's cost of service to be reimbursed by the ratepayers" under the "rate base-rate of return" system. Id. at 584. Under the system, consumers pay a fair return on the utility's capital and in addition pays the costs of operation (including taxes). Id. at 585.

which would have been due if the Petitioner had adopted straight-line depreciation." Id. Petitioner was also allowed to amortize the tax savings obtained by the investment tax credit over the useful life of its depreciable plant. Id. This methodology resulted in the ratepayers being "charged not the actual income taxes paid but a hypothetical larger figure for Petitioner's tax expense computed as if depreciation were determined on a straight-line basis, and as if the investment credit were distributed in equal amounts over the plant's useful life." Id. The difference between actual and hypothetical taxes was accumulated in a "deferred tax" reserve account. Id. at 584-85.

A panel of this Court, addressing the City's claim on appeal that the "consumer contributed" funds should be excluded from the Petitioner's jurisdictional electric rate base, observed "[u]nder traditional regulatory concepts, utility company shareholders and bondholders, not the consumers, furnish the capital necessary for the operation of the business." Id. at 585. Accordingly, "customer contributions in aid of construction cannot be included in the fair value of the property upon which the utility's return is determined." Id. (citing Public Serv. Comm'n v. City of Indianapolis, 235 Ind. 70, 93, 131 N.E.2d 308, 317 (1956)).

Ultimately, this Court held that the funds "extracted from the ratepayers and held in reserve to meet future tax liabilities" constituted consumer-contributed capital; the Petitioner had employed the $6.5 million in reserves in the same manner as investor-contributed capital; and the method adopted by the Commission for the treatment of Petitioner's "deferred tax" reserves had resulted in a schedule of rates that were not "reasonable and just" as required by

16

statutory authority. Id. at 585-87. In so holding, the Court rejected the City's contention that the Public Service Commission Act requires exclusion of consumer-contributed capital from the rate base in all cases, recognizing that the decision of whether to include a portion of the deferred tax reserves was best consigned "to the Commission's informed discretion."[12] Id. at 587.

Duke does not dispute the general proposition that a proper return on investment excludes allowing a return on customer-contributed funds. However, Duke denies that such a return was permitted in this particular case and observes that the AFUCD issue has been litigated.

Indeed, this is not the Interveners' initial challenge to the AFUDC calculation. The AFUDC methodology is in accordance with a settlement approved by the Commission and was unsuccessfully challenged on appeal of prior litigation between the same parties. The order on IGCC 10, which gave rise to the instant appeal, implemented the settlement in this respect.

"Res judicata prevents the repetitious litigation of disputes that are essentially the same." Wright v. State, 881 N.E.2d 1018, 1021 (Ind. Ct. App. 2008), trans. denied. This doctrine is divided into two branches: claim preclusion and issue preclusion. Id. at 1022. Issue preclusion, also referred to as collateral estoppel, precludes re-litigation of issues actually and necessarily decided in an earlier litigation between the same parties or those in privity with the parties. Scott v. Scott, 668 N.E.2d 691, 699 (Ind. Ct. App. 1996).

---

[12] The Commission could decide to allow the Petitioner the use of the reserve as working capital and assign the funds a zero cost of capital in computing the fair rate of return. Id.

Furthermore, a party cannot escape the effect of claim preclusion merely by using different language in framing the issue and defining the alleged error. Ben-Yisrayl v. State, 738 N.E.2d 253, 258 (Ind. 2000).

In Duke II, we addressed the Intervener's contention that "the computation of AFUDC failed to account for an 'interest-free loan from customers' in the form of deferred utility taxes":

> Interveners challenge the approval of the portion of the settlement specifying allowable AFUDC (or financing costs incurred during construction), claiming that it unreasonably fails to account for Duke's free use of funds when it collected taxes from ratepayers and then deferred payments to taxing authorities.[13] More specifically, Interveners observe that deferred taxes were taken into account in calculating financing costs recoverable, monthly, in the form of CWIP (return on construction work in progress)[14] but "ignored the impact of this interest-free loan from customers in calculating Duke's rate of return for capitalized financing costs, AFUDC." Interveners' Brief at 86. Then, according to Interveners, "The Commission provided no justification for this disparate treatment of these two types of financing costs." Interveners' Brief at 86.

---

[13] During the hearings, Interveners had contended that the treatment of deferred taxes was intended to be a "reward for cost containment" and – dissatisfied with a prospective relinquishment of the incentive – had requested a refund of deferred taxes already collected. ([Duke II] Tr. 34, 795.)

[14] In light of allegations that Duke received a windfall in which the ratepayers did not share, Wes Blakley addressed the question "Does the Agreement discuss the inclusion of zero cost deferred income taxes in the capital structure" as follows:

Yes. [Duke] has agreed on a prospective basis to include zero cost deferred taxes in the capital structure, which effectively reduces the weighted cost of capital. Exclusion of zero cost capital from the capital structure had been granted in the original CPCN order in Cause No. 43114 as a form of incentive to [Duke] and was capped at $1.985 billion of IGCC investment. The actual impact that the exclusion of deferred income taxes has on the capital structure varies with the weighting of deferred income taxes as well as the weighting of other elements in the capital structure. The incentive provided about a 100 basis point increase in the weighted cost of capital. This increase in the weighted cost of capital, when applied to the amount of IGCC investment eligible for the incentive, equates to about $22 million of additional revenue requirement on an annual basis. By removing this incentive, ratepayers would immediately benefit from the reduced weighted average rate of return in the initial amount of approximately $22 million annually. ([Duke II] Tr. 35,224.)

Duke, in turn, claims that the agreed treatment of AFUDC was in accordance with the Commission's rules and that the Commission's rules incorporate federal rate-setting regulations. More specifically, Duke directs our attention to 18 C.F.R. Part 101, Electric Plant Instruction No. 3(a)(17) (part of the Uniform System of Accounting promulgated by the Federal Energy Regulatory Commission, reciting a formula and elements for the computation of AFUDC that does not specify inclusion of deferred taxes).

According to Duke, the exclusion of deferred tax balances from the calculation of a utility's AFUDC is both historical and consistent with the federal uniform accounting principles.[15] Duke asserts that customers benefit from including the utility's deferred tax balance in base rate calculation and its inclusion in the calculation of AFUDC would create potential for double recovery. Also, Duke observes that projects under construction do not generate deferred taxes prior to being placed in service.[16]

Danny Wiles, Director of Regulated Accounting for Duke, testified that, in general, Duke "will follow normal accounting guidance for determining whether a specific cost item should be capitalized to the IGCC construction project, expensed as an operating and maintenance expense item, or capitalized as an ongoing plant addition" and further testified that the Settlement Agreement was not inconsistent with normal accounting rules. (Tr. 35,302.) Too, Kent Freeman testified "the deferred tax incentive does not impact the rate of return calculation or the AFUDC rates[.]" (Tr. 34,693.)

On appeal, Interveners fail to support their bald assertion of improper calculation with identification of relevant testimony or generally accepted accounting principles in support of their position. We cannot, based upon Intervener's simple assertion, conclude that a necessary component was excluded that resulted in an improper calculation. We are not permitted to conduct a trial de novo. Citizens Action Coalition v. N. Ind. Pub. Serv. Co., 804 N.E.2d 289, 294 (Ind. Ct. App. 2004). Moreover, we are mindful that the Commission has particular expertise in the area of ratemaking and is not

---

[15] In response to questioning on the difference in a rate of return for CWIP and the rate of return for AFUDC, Duke Energy Business Services rate strategist Kent Freeman testified: "Traditionally, there always has been. AFUDC has, to my knowledge, not included the deferred taxes or any – for any of our projects, so that is – we're kind of going back to traditional retail ratemaking, which is the deferred taxes in the cap structure for the rate of return calculation, but we've not changed how we've done AFUDC for as far back as I'm aware." ([Duke II] Tr. 34,713-14.)

[16] Kent Freeman explained: "But AFUDC is applied during a construction period, so at that point, there's no deferred taxes – at least this is my understanding – so there's really no deferred taxes that are a rate base reduction at that point in time." ([Duke II] Tr. 34,712.)

19

> obligated to enter a particular finding on each aspect of evidence introduced. See Nextel West, 831 N.E.2d at 156-57 (recognizing that there is no requirement for substantiation of each component where the ultimate conclusion of public interest is adequately supported by findings).

Duke II, No. 93A02-1301-EX-76, Slip op. at 12-13.

Ultimately, the Commission is charged with the independent oversight of ratemaking decisions. The Commission is in the best position to determine a proper rate of return on capital from utility investors, and we defer to their expertise where appropriate. Interveners were given a full and fair opportunity, in the context of the settlement proceedings and appeal, to demonstrate that deference would not be warranted in these circumstances because an improper mathematical computation allowed a return on customer investment. Having fully litigated the propriety of the AFUDC calculation in the prior appeal, Interveners are not entitled to a second bite at the apple.

## Conclusion

The Interveners have not demonstrated that the Commission acted contrary to law by approving the order in ICGG-10.

Affirmed.

KIRSCH, J., and MAY, J., concur.